# In the United States Court of Federal Claims

**No. 18-1515C**
**Filed: October 25, 2018**
**Redacted Version Issued for Publication: November 5, 2018[1]**

| | |
|---|---|
| \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*\* | \* |
| | \* |
| **SAFEGUARD BASE OPERATIONS, LLC,** | \* |
| | \* |
| Protestor, | \* |
| | \* |
| v. | \* **Post-Award Bid Protest; CICA Stay** |
| | \* **Override; Motion for Temporary** |
| **UNITED STATES,** | \* **Restraining Order; Motion for** |
| | \* **Preliminary Injunction.** |
| Defendant, | \* |
| | \* |
| v. | \* |
| | \* |
| **B&O JOINT VENTURE, LLC,** | \* |
| | \* |
| Defendant-Intervenor. | \* |
| | \* |
| \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*\* | \* |

**Alexander B. Ginsberg,** Pillsbury Winthrop Shaw Pittman, LLP, McLean, VA, for protestor. Of counsel was **Alex D. Tomaszczuk**, Pillsbury Winthrop Shaw Pittman, LLP, McLean, VA, **Aaron S. Ralph** and **Kevin R. Massoudi**, Pillsbury Winthrop Shaw Pittman, LLP, Los Angeles, CA, and **Diana Parks Curran** and **Hadeel Masseoud**, Curran Legal Services, Johns Creek, GA.

**P. Davis Oliver**, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Douglas K. Mickle**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Joseph H. Hunt**, Assistant Attorney General. Of counsel was **James C. Caine**, Attorney, Federal Law Enforcement Training Centers, Glynco, GA.

---

[1] This Opinion was issued under seal on October 25, 2018. The parties were asked to propose redactions prior to public release of the Opinion. Defendant responded that defendant "does not propose any redactions to the Court's sealed opinion." Defendant-intervenor proposed to redact information defendant-intervenor identified as its "proprietary pricing." Protestor proposed to redact several types of non-public information, which protestor asserts to be confidential and exempt from public disclosure. This opinion is issued with all of the redactions that the parties proposed in response to the court's request. Words which are redacted are reflected with the notation: "[redacted]."

**Richard W. Arnholt**, Bass, Berry & Sims PLC, Washington, D.C., for defendant-intervenor. Of counsel was **Todd R. Overman**, Bass, Berry & Sims PLC, Washington, D.C.

# O P I N I O N

## HORN, J.

Before the court is protestor's second motion for a temporary restraining order and preliminary injunction, in which protestor challenges the decision of the United States Department of Homeland Security (DHS), Federal Law Enforcement Training Centers (the Agency), to override the automatic stay of performance required by the Competition in Contracting Act (CICA), 31 U.S.C. § 3553 (2012), upon protestor's filing of a bid protest at the United States Government Accountability Office (GAO).

In protestor's October 3, 2018 amended complaint, Safeguard Base Operations, LLC (Safeguard), a joint venture which is the protestor in the above-captioned bid protest, states in its amended complaint that the Safeguard joint venture is an "unpopulated joint venture" consisting of Safeguard Security Operations, LLC (SSL) and SRM Group, Inc. (SRM Group). According to an October 9, 2018 declaration signed by Michael D. Randall, who states that he is the CEO of SSL, SSL is the fifty-one percent owner of Safeguard joint venture, and SRM Group is the forty-nine percent owner of the Safeguard joint venture.

On June 28, 2012, the Agency awarded Contract No. HSFLGL-12-C-00006 to SRM Group (the SRM Group Contract). Safeguard indicates in its amended complaint in this court that the 2012 SRM Group Contract required SRM Group to provide "dormitory maintenance" services at the Federal Law Enforcement Training Center in Glynco, Georgia. The SRM Group Contract was set-aside for contractors qualified as part of the Small Business Administration's (SBA's) 8(a) program.[2] The SRM Group Contract had a phase-in period of July 1 to July 15, 2012, and a base period of performance beginning on July 16, 2012 and ending on September 30, 2012. The SRM Group Contract also contained Federal Acquisition (FAR) § 52.217-9, which stated that "[t]he total duration of this contract, including the exercise of any options under this clause, shall not exceed <u>60 months or 5 years</u>."[3] (emphasis in original). According to protestor's amended complaint

---

[2] "The '8(a) program,' named after Section 8(a) of the Small Business Act, permits the government to award certain contracts exclusively to small businesses that are certified as socially and economically disadvantaged." Hugh B. McClean, <u>The Diversity Rationale for Affirmative Action in Military Contracting</u>, 66 CATH. U. L. REV. 745, 746 (2017) (citing 15 U.S.C. § 637(a)(1)(B) (2012)).

[3] As discussed below, if all option periods of performance in the 2012 SRM Group Contract were exercised, the SRM Group Contract would have ended on June 30, 2017, which is five years after performance under the SRM Group Contract began on July 1, 2012. The SRM Group Contract included FAR § 52.217-8, which permitted the Agency

and the Agency's October 2, 2018 Determination and Findings,[4] the SRM Group Contract contained multiple option periods of performance, all of which were exercised by the Agency. The Agency's October 2, 2018 Determination and Findings indicates that the SRM Group Contract, after the exercise of all option periods of performance, originally was set to expire on June 30, 2017.

In the Agency's October 2, 2018 Determination and Findings, Ms. Fowler states that "FAR clause 52.217-8 Option to Extend Services[5] was in the contract and FLETC [Federal Law Enforcement Training Center] exercised it." On June 28, 2012, the Agency issued a three-month extension under FAR § 52.217-8 to the SRM Group Contract, which extended the SRM Group Contract to September 30, 2017. On September 7, 2017, the Agency issued a second three-month extension under FAR § 52.217-8 to the SRM Group Contract, which extended SRM Group's performance to December 31, 2017. Defendant and defendant-intervenor assert that the SRM Group Contract with the Agency was completed on December 31, 2017, when the second three-month extension under FAR § 52.217-8 ended.

On October 11, 2017, the Agency issued Request for Proposal No. HSFLGL-17-R-00001 (the Solicitation) as a "competitive 8(a) Set-Aside." The Solicitation stated that award would be made on a "best value" basis, and that the "period of performance of this contract will be a base period of three (3) months and seven (7) 12-month option periods." Under a section titled "Solicitation General Information," the Solicitation stated: "Pricing Schedule and Periods of Performance (POP) Service dates for each CLIN [Contract Line Item Number] are detailed in Section B. Note: Exceptions to line item structure in Section B may result in a bid not considered for award." (capitalization in original).

The Solicitation's performance work statement stated that the Federal Law Enforcement Center in Glynco, Georgia, is located on approximately 2,000 acres in southeast Georgia and "is responsible for providing law enforcement officer training to

---

to extend the SRM Group Contract by six months to December 31, 2017 after the last option period of performance ended on June 30, 2017.

[4] As discussed below, on October 2, 2018, the Agency issued its Determination and Findings in support of its decision to override the CICA stay in the above-captioned bid protest. Robin D. Fowler, "Head of the Contracting Activity, Federal Law Enforcement Training Centers (FLETC)," issued and signed the Agency's October 2, 2018 Determination and Findings.

[5] The version of FAR § 52.217-8 in the SRM Group Contract states:

The Government may require continued performance of any services within the limits and at the rates specified in the contract. These rates may be adjusted only as a result of revisions to prevailing labor rates provided by the Secretary of Labor. The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months.

over 95 Partner Organizations and is responsible for providing certain core instructional law enforcement programs as well as a variety of support services." The performance work statement stated that the Glynco, Georgia, Federal Law Enforcement Training Center "has lodging for approximately 2,093 occupants." The performance work statement also stated that:

> The Contractor shall provide all labor, supplies, materials, equipment, including safety and protective gear, repair parts, tools, equipment, planning, scheduling and coordination, training, licenses, permits, certificates, insurance, pre-employment screening, reports and files, management, and supervision necessary to perform dormitory custodial, desk clerk, locksmith, and maintenance services for nine (9) dormitories, five (5) student centers, one (1) laundry center and other facilities as described throughout the Performance Work Statement (PWS).

On November 2, 2017, the Agency completed a Justification and Approval pursuant to FAR § 6.302-2 (2017), which "extend[ed]" SRM Group's performance to June 30, 2018. Under FAR § 6.302-2, "[w]hen the agency's need for the supplies or services is of such an unusual and compelling urgency that the Government would be seriously injured unless the agency is permitted to limit the number of sources from which it solicits bids or proposals, full and open competition need not be provided for." See FAR § 6.302-2(a)(2). FAR § 6.302-2 applies when "(1) an unusual and compelling urgency precludes full and open competition, and (2) delay in award of a contract would result in serious injury, financial or other, to the Government." See FAR § 6.302-2(b). The November 2, 2017 Justification and Approval indicated that the Agency was entering "into a six month contract extension on a basis of other than full and open competition beyond the current contract period" of SRM Group's performance. The November 2, 2017 Justification and Approval asserted that "Dorm Management Services are critical to sustain FLETC's ability to train the Federal Law Enforcement Officers. This contract extension will maintain contract support until a new contract can be awarded." The November 2, 2017 Justification and Approval also asserted that "[a] lapse in contract support would present an unacceptable risk to FLETC. Should these critical services become unavailable, it would have a major, negative impact on the ability of the FLETC to provide critical training to approximately 95 federal agencies partnered with FLETC." Defendant asserts that, on December 31, 2017, "SRM's contract was over" following the expiration of the two three-month extensions pursuant to FAR § 52.217-8, and that the November 2, 2017 Justification and Approval, as well as the subsequent Justifications and Approvals discussed below, did not extend the SRM Group Contract as awarded in 2012. Defendant asserts:

> Solely for the sake of administrative convenience, FLETC effectuated the sole-source contract actions through "modifications" to SRM's contract, even though SRM's contract had run its course and could not be extended further after the exercise of the FAR 52.217-8 option. This "modifications" approach avoided delays that would have been caused by certain pre-award reviews, generation of new clauses (which could cause pricing

impacts), and the need to obtain a temporary waiver from the SBA for a new award of an 8(a) approved program project to a non-8(a) firm.[6]

(internal references omitted).

According to Safeguard's second motion for a temporary restraining order and a preliminary injunction, on March 16, 2018, Safeguard submitted a timely proposal in response to the Solicitation. On June 12, 2018, the DHS Office of Legislative Affairs approved of an award under the Solicitation to B&O Joint Venture, LLC (B&O). On June 14, 2018, the Agency notified Safeguard that B&O was the apparent awardee under the Solicitation.[7] In the Agency's Determination and Findings, Ms. Fowler states that, on June 18, 2018, Safeguard filed a size protest with the Small Business Administration (SBA). Ms. Fowler also states that, on June 22, 2018, Safeguard filed a pre-award bid protest with the GAO alleging that the Agency had "conducted an arbitrary and capricious evaluation." According to Ms. Fowler, "[a]s a result of these protest actions, FLETC issued a one-month contract extension to the incumbent contractor, SRM Group, Inc., to continue services through July 31, 2018." Indeed, on June 22, 2018, the Agency had issued a second Justification and Approval pursuant to FAR § 6.302-2 (2018) on the basis of unusual and compelling urgency, which stated that the Agency was "extend[ing]" SRM Group's performance to July 31, 2018.

In the October 2, 2018 Determination and Findings, Ms. Fowler states that, on July 16, 2018, the Agency informed the GAO of its intent to take corrective action by having the source selection authority reconsider the proposal evaluation results and render a new award decision. Four days later, on July 20, 2018, Ms. Fowler states that the SBA determined that the "apparent awardee" under the source selection authority's first proposal evaluation, B&O, "was a small business, and therefore was eligible for award." Ms. Fowler states that, "[a]t this time," given the Agency's voluntary corrective action in response to Safeguard's pre-award bid protest at the GAO, "it was necessary for FLETC to issue another one-month contract extension to the incumbent contractor, SRM Group, Inc., to continue services through August 31, 2018." On July 27, 2018, the Agency, again, issued a Justification and Approval pursuant to FAR § 6.302-2 on the basis of unusual and compelling urgency, which indicated that the Agency was "extend[ing]" SRM Group's performance to August 31, 2018.

Safeguard and the Agency's Determination and Findings state that, on August 7, 2018, the Agency notified Safeguard that the Agency had selected B&O for award under the Solicitation. Safeguard asserts that:

On August 14, 2018, DHS sent Safeguard a written post-award debriefing, which disclosed the following information concerning DHS' evaluation of Safeguard's and B&O's proposals:

---

[6] Neither the Agency nor defendant cited to a regulation requiring "a temporary waiver from the SBA for a new award of an 8(a) approved program project to a non-8(a) firm."

[7] B&O is the defendant-intervenor in the above-captioned bid protest.

[redacted]

Given the material price advantage of Safeguard's proposal – despite DHS' unexplained and irrational upward adjustments to Safeguard's proposed price of $[redacted] – Safeguard filed a protest (the "First Post-Award Protest") with the GAO, which docketed the protest as B-415588.4.

On August 28, 2018, the Agency sent a notice to the GAO stating:

The agency will take corrective action in response to the protest, and therefore respectfully requests, that in accordance with its rules, the GAO dismiss this protest. Specifically, in response to the protestor's allegations, the agency discovered that it made mistakes in the consideration of protestor's proposal. The agency will correct these errors in a new source selection decision.

According to Safeguard, the GAO dismissed "the First Post-Award Protest as academic on August 31, 2018." In the Agency's Determinations and Findings, Robin Fowler states that the contracting officer "suspended performance on the new contract award and then issued another one-month contract extension to the incumbent contract, SRM Group, Inc., to continue services through September 30, 2018." Ms. Fowler's statement references that, on August 29, 2018, the Agency issued a fourth Justification and Approval pursuant to FAR § 6.302-2 on the basis of unusual and compelling urgency, which stated that the Agency was "extend[ing]" SRM Group's performance to September 30, 2018.

On September 20, 2018, the Agency sent a letter to Safeguard stating that Safeguard's "proposal for the subject solicitation was unsuccessful and that a proposal revision will not be considered." The September 20, 2018 letter indicated that "[o]nly one award was made to" B&O, and that the "total estimated amount" "for the base period and all options" was $77,734,857.02. According to Safeguard, "Safeguard's proposed price of $[redacted] remains over $[redacted] *lower* than B&O's proposed price." (emphasis in original). The September 20, 2018 letter also stated that:

In general terms, Safeguard Base Operations' (SBO) price proposal was determined non-compliant because the price volume failed to include government provided amounts for the Service Work Request CLINs, which was required by Amendment 00003 to the solicitation. The government response to Question Number 9 specifically stated:" [sic] A. For bidding purposes please include the following "not-to-exceed" amounts in the applicable CLIN:

| CLIN | AMOUNT | CLIN | AMOUNT | CLIN | AMOUNT |
|------|--------|------|--------|------|--------|
| 0007AA | $124,688.00 | 3007AA | $549,872.00 | 6007AA | $636,546.00 |
| 0007AB | $ 59,063.00 | 3007AB | $260,466.00 | 6007AB | $301,522.00 |

| 1007AA | $498,750.00 | 4007AA | $577,366.00 | 7007AA | $636,546.00 |
| 1007AB | $236,250.00 | 4007AB | $273,489.00 | 7007AB | $301,522.00 |
| 2007AA | $523,688.00 | 5007AA | $606,234.00 | | |
| 2007AB | $248,063.00 | 5007AB | $287,163.00 | | |

The solicitation further specifically stated the following: "Exceptions to the line item structure in Section B may result in a bid not considered for award." Therefore, Safeguard Base Operations LLC-JV is not eligible for award.

Because there is no other evaluation information to provide, this letter also serves as your post-award debriefing in accordance with Federal Acquisition Regulation 15.506.

On September 25, 2018, Safeguard filed a second post-award bid protest of the Agency's award under the Solicitation at the GAO. In its second post-award bid protest at the GAO, Safeguard argues that "DHS conducted an unreasonable and disparate pricing evaluation," and that "DHS conducted a flawed best value trade-off." In its second motion for a temporary restraining order and preliminary injunction, Safeguard states that the "GAO issued an Acknowledgment Package and Protective Order on September 26, 2018 indicating that an Agency Report is due by October 25, 2018. GAO's decision on the merits is scheduled to be issued by January 3, 2019." (capitalization in original).

On September 27, 2018, Suresh S. Prabhu, President of SRM Group, sent an email message to Sheryle Wood, a contracting officer with the DHS, attached to which was SRM Group's "Unsolicited Offer to Extend Services on the Housing Project at the current rates for 1 or 3 months." (capitalization in original). The attachment provides the following two options to DHS: "Option 1: Extend Services by 1 month to go the end of October 2018 at current rates (September 2018 rates) Option 2: Extend Services by 3 month to go the end of December 2018 at current rates (September 2018 rates)."

At 7:04 a.m. on September 28, 2018, contracting officer Sheryle Wood sent an email message to Ralph Thomas, who appears to be an employee of SRM Group, stating "[w]e will be holding a phase out/phase in meeting today at 9AM at Townhouse 398. This will be a joint meeting between B&O JV, SRM Group, SSD, and PRO. Please plan on attending." In its second motion for a temporary restraining order and preliminary injunction, Safeguard states:

On Friday, September 28, 2018, DHS notified SRM personnel that SRM's last day of performance would be Sunday, September 30, 2018, and that DHS wanted all SRM property removed from FLETC premises by the weekend of September 29, 2018 so that B&O could commence performance of housing management support services at FLETC in SRM's place.

The next day, on September 29, 2018, James Caine, an attorney with DHS, sent an email message to Diana Curran, who lists herself as of counsel for the protestor in the

above-captioned protest. Mr. Caine's September 29, 2018 email message stated that "[w]e received your CFC [United States Court of Federal Claims] pre-award filing notice[8] on the Dormitory Maintenance contract and envision having a D&F [Determination and Findings] to provide you and GAO as it is in progress and the team is working to complete it this weekend."

On September 30, 2018, Safeguard's contract to provide dormitory maintenance services to the Agency expired, and, on October 1, 2018, the Agency transitioned to B&O's dormitory maintenance services contract with the Agency. Safeguard submitted to the court an October 2, 2018 declaration signed by Suresh S. Prabhu,[9] who states that he is the president of SRM Group, in which Mr. Prabhu describes what he considers to be "the chaos at FLETC" during the Agency's transition to B&O. According to the subsequently filed October 2, 2018 declaration signed by Suresh S. Prabhu, "SRM employed a Project Management team of [redacted] personnel subject to non-compete clauses as part of their employment contract that prevents them from lawfully being employed by the currently performing contractor for housing services at FLETC, B&O." Safeguard asserts that the Agency's transition to B&O has "left in place most, if not all, of SRM's non-senior incumbent employees."

On October 1, 2018, Safeguard filed its complaint with this court in the above-captioned bid protest, which challenged the Agency's override of the CICA stay while Safeguard's second post-award bid protest was pending at the GAO. Safeguard filed a motion for a temporary restraining order and preliminary injunction that same day. Also on the same day, October 1, 2018, the court held a hearing with the parties in the above-captioned bid protest. During the hearing, the court denied Safeguard's motion for a temporary restraining order and preliminary injunction, subject to protestor's renewal, if appropriate. At the October 1, 2018 hearing, counsel of record for defendant indicated that the Agency was currently working on finalizing a Determination and Findings to support its decision to override the CICA stay and that the Agency anticipated issuing the Determination and Findings by 10:30 a.m., EDT, on October 2, 2018.

On the morning of October 2, 2018, Robin D. Fowler, "Head of the Contracting Activity, Federal Law Enforcement Training Centers," issued a Determination and Findings stating that:

> Upon the basis of the following findings, I, Robin D. Fowler, Head of the Contracting Activity, Federal Law Enforcement Training Centers (FLETC), have determined that performance of the contract for Dorm Management Services in support of FLETC Glynco is authorized to proceed in the face of a Government Accountability Office *(GAO)* protest (B-415588) filed by

---

[8] Safeguard submitted its pre-filing notice to the United States Court of Federal Claims on the evening of September 28, 2018.

[9] Safeguard has submitted to the court three declarations signed by Suresh S. Prahbu. The first declaration is dated September 28, 2018, the second declaration is dated October 2, 2018, and the third declaration is dated October 13, 2018.

Safeguard Base Operations, LLC (SBO) as continuing performance is both based upon urgent and compelling circumstances that affect the interests of the United States and that it is also in the best interests of the United States.

(emphasis in original).

According to Ms. Fowler, Safeguard's second post-award bid protest at the GAO contains the two following allegations: 1) that the Agency conducted an unreasonable and disparate pricing evaluation; and 2) that the Agency conducted a flawed best value trade-off. Regarding the first allegation, Ms. Fowler alleges that Safeguard, in its proposal in response to the Solicitation, failed to price a series of Contract Item Line Numbers (CLINs) "in the amount of $6.1M as specifically directed by the solicitation, as amended." Ms. Fowler states that Safeguard's failure to price the CLINs "rendered their price proposal non-compliant as offerors were warned could happen." Regarding Safeguard's allegation of a flawed best value trade-off, Ms. Fowler states that Safeguard's "price proposal was non-compliant and could not be compared to other prices in a trade-off analysis. However, they were also not the highest technically evaluated offeror and the SSA [source selection authority] determined the premium price that would be paid to the highest rated offeror was the best value to the Government." Ms. Fowler states that, when making his decision to override the CICA stay, she consulted with James Caine, "FLETC's procurement attorney," "regarding the merits of the protest that triggered the CICA stay." According to Ms. Fowler, based on Mr. Caine's review of Safeguard's second post-award bid protest at the GAO, the Agency's "position appears to be defensible and well supported by law and fact." Ms. Fowler also asserts that, "[e]ven if GAO were to sustain the protest, however, the interests at risk from delay are so great that they overcome the risks to the Agency of an adverse ruling by the GAO."

Under a heading in the Determination and Findings titled "Existing Contract and Protest," Ms. Fowler states that the Federal Law Enforcement Training Center "prepares the federal law enforcement community to safeguard the American people, our homeland, and our values by providing basic and advanced law enforcement training to more than ninety-five Federal Partner Organizations." (capitalization in original). Ms. Fowler asserts that a "critical part of this training mission is lodging our law enforcement students," and that the Federal Law Enforcement Training Center in Glynco, Georgia, currently has nine on-site dormitories with over 2,000 rooms. Ms. Fowler states, "[a]t this time, there is no existing contract with the incumbent that may be extended, they have ended the period of performance of the last extension, and FLETC has fully transitioned to performance by the awardee." According to Ms. Fowler, the Agency

cannot do without these services without jeopardizing FLETC's ability to train Federal law enforcement officers, including Custom and Border Patrol and Immigration and Customs Enforcement officer, as well as Transportation Security Administration airport screeners and could ultimately impact the ability of our partner organizations to field qualified law enforcement agents and screeners.

Ms. Fowler also states:

> In August, 2018, I learned from counsel, that the interested party's attorneys had objected to and expressed concern that the bridge contracts that FLETC executed to obtain services during the protest, were obtained from a contractor who was not in the 8A program and the acquisition was in the 8A program. Although, a standard practice at FLETC during protests was awarding bridge contracts to the incumbent, I realized that this was not a good practice in this case, and was contrary to my obligation to comply with and fully support the Small Business Administration's 8A program. This lead to my decision to not award a new bridge contract to any contractor outside the 8A program. It takes a total of five days to complete the congressional notification process required for new awards in excess of one million dollars. Thus, it was impossible to prepare and award a bridge contract to the awardee for just the 120-day period required to complete the GAO protest process in time to avoid doing without these services and jeopardizing training. Therefore, I had no choice but to override the Stay to ensure continued performance.

Under a heading in the October 2, 2018 Determination and Findings titled "Basis for the Stay Override," Ms. Fowler addresses the Agency's asserted multiple reasons for overriding the CICA stay, which include overriding the CICA stay because of urgent and compelling circumstances and because the override is in the best interests of the United States. Ms. Fowler alleges that there are "**Urgent and Compelling circumstances that significantly affect the interests of the United States that will not permit waiting for the GAO decision on the merits of the protest** [Safeguard's second post-award bid protest at the GAO]." (emphasis in original). Ms. Fowler asserts that "[e]ach extension has been a separate contract action supported by a Justification and Approval (J&A) authorizing the continuation of services under the status quo requirements." Ms. Fowler argues that SRM Group "is no longer an 8(a) contractor, having graduated approximately two years ago," and, "[t]herefore, it is no longer feasible or proper to continue services under the current contract to a contractor who is not even an 8A contractor." Ms. Fowler states that "the only other option vice an override is to forego these vital services throughout the GAO protest period." When addressing the alleged urgent and compelling circumstances, Ms. Fowler asserts:

> The impacts, as described in the [October 1, 2018] affidavit of Thomas J. Walters, Director of FLETC, would be as follows:
>
> 1) Adversely impact FLETC training operations and could potentially lead to classes being cancelled due to lodging disruption;
> 2) Could cause training to be unaffordable for our Partner Organizations as we would attempt to use off-center lodging and it would be much more expensive, and in some cases the Director believes they would pull students from training as it would be unaffordable;

> 3) Due to upcoming CBP and ICE surge any disruption to lodging at a time when we are looking for greater lodging capacity by double bunking and more aggressive commercial lodging could jeopardize ability to meet the requirements of the surge;
>
> 4) FLETC has limited staff and equipment resources and it is not clear we could adequately clean common areas, issue keys, and maintain the buildings adequate to meet health and safety needs which may well result in the loss of the use of these dormitories even if we required students to clean their own linens and rooms. Taking these steps would negatively impact training as our training program is demanding, and does not have student time included in the training schedule for room and linen cleaning.

Additionally, in the October 1, 2018 affidavit signed by Thomas J. Walters, "Director of FLETC," Mr. Walters states that:

> FLETC has begun planning efforts to meet the anticipated surge in training that CBP and ICE will require to meet the hiring goals associated with Executive Order 13767, *Border Security and Immigration Enforcement Improvements*, and Executive Order 13768, *Enhancing Public Safety in the Interior of the United States.* To meet the intents of these Executive Orders, CBP will hire 5,000 Border Patrol Agents and ICE will hire 10,000 Immigration Officers; FLETC will be responsible for training almost all of them.

(emphasis in original).

Ms. Fowler also asserts that "**[c]ontinued performance is in the Best Interests of the United States**." (emphasis and capitalization in original). Ms. Fowler states:

> The corrective actions over the past 3 months have resulted in a monthly contract extension to the incumbent contractor. The first extension resulted in an 11% increase over previous prices, which equals to $104,494.15. The second extension resulted in an additional 7.5% increase, which equals $20,125.99. Then finally, the third extension resulted in an additional 6% increase, which equals $30,682.44. In total, FLETC is now paying in excess of 26% over the original negotiated cost of these services, or $155,372.58 per month. The incumbent, SRM's current monthly price is $325,979.12 over what we would be paying the awardee if the award were not suspended as a result of the first protest, and would cause us to expend close to $1.3 million for the period of the protest more than necessary, had we continued performance with the incumbent. Thus it would fiscally irresponsible to continue down this path, rather than continue services under the newly awarded contract that was determined to offer the best value to the government and not in the best interests of the Government.

Additionally, by overriding the stay of performance, the period of performance is now long enough for the contractor to begin to implement double-bunking in two dormitories, which is critical to resolving the shortage of on-center lodging.

Finally, and most importantly, as stated previously, this is an 8(a) designated service and the incumbent continuing to perform the work via a bridge contract (extension) would go against the rules of the 8(a) program. The awardee had demonstrated they are the most qualified 8A to perform this work.

Following the Ms. Fowler's discussion of urgent and compelling circumstances and the best interests of the United States in the October 2, 2018 Determination and Findings, under a heading titled "**HARM – DAMAGES**," Ms. Fowler states that:

If the Stay of performance continues, the adverse effect could be catastrophic and it is impossible to quantify the harm that could result from Federal Law Enforcement Agencies fielding an inadequate number of officers and airport screeners. However, FLETC's Chief Financial Officer informed me the impact of replacing on-center lodging with off-center lodging, assuming adequate off-center lodging was even available, would be approximately $20 million over the course of a 120-day extension.

(emphasis and capitalization in original).

The next day, on October 3, 2018, Safeguard filed an amended complaint reasserting that the Agency's decision to override the CICA stay was arbitrary and capricious and contrary to law. In the amended complaint, Safeguard asserted that the Agency's October 2, 2018 Determination and Findings "relies almost exclusively on the rationale deemed irrelevant to a CICA override decision." Safeguard requests in its amended complaint a declaration "that Defendant's decision to override the CICA stay issued in connection with Safeguard's pending GAO protest award was arbitrary, capricious and contrary to law," a preliminary and permanent injunction, and "[s]uch further relief as this Court deems just and proper."

On October 4, 2018, Safeguard filed a second motion for a temporary restraining order and preliminary injunction. In its October 4, 2018 motion, Safeguard argues that, because neither of the Agency's two "justifications is rational or defensible under the four-factor test established by Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705, 711 (2006), DHS' override decision is arbitrary, capricious and contrary to law." Safeguard "respectfully requests that this Court declare DHS' CICA stay override to be unjustified and unlawful and enjoin DHS from proceeding with any further transition to or performance by B&O during the pendency of Safeguard's GAO protest."

On October 15, 2018, defendant and defendant-intervenor filed responses to Safeguard's motion for a temporary restraining order and preliminary injunction.

Defendant and defendant-intervenor both assert that the Agency's decision to override the CICA stay implemented in connection with Safeguard's second post-award bid protest was rational, and that the court should not grant Safeguard's second motion for a temporary restraining order and preliminary injunction.

On October 16, 2018, defendant filed the administrative record in the above-captioned protest. On October 17, 2018, the court heard oral argument regarding Safeguard's second motion for a temporary restraining order and preliminary injunction. During the October 17, 2018 oral argument, the issue of whether Safeguard has standing to challenge the Agency's decision to override the CICA stay implemented in connection with Safeguard's second post-award bid protest at the GAO was discussed. Defendant, for the first time, indicated that the government thought that Safeguard did not have standing to maintain its challenge to the Agency's override in the above-captioned bid protest.

On October 18, 2018, the parties submitted supplemental filings to the court addressing Safeguard's standing. Safeguard argues that, "based on clear precedent from this Court, Safeguard has standing in this CICA override challenge by mere virtue of its status as an actual offeror and actual GAO protester in this procurement." Defendant, in its brief submission to the court, which was devoid of any serious analysis, concluded that, "because SBO has failed to demonstrate that it has suffered an 'injury-in-fact' as a result of FLETC's override decision, SBO does not have standing to challenge that decision." Defendant-intervenor, in an equally brief and sparse filing, concluded simply that "[i]ntervenor concurs with the Defendant that Plaintiff [protestor] does not have standing."

On October 24, 2018, the court issued an oral decision in a hearing with the parties. This decision incorporates and memorializes the October 24, 2018 oral decision.

## DISCUSSION

The Tucker Act grants the United States Court of Federal Claims

jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(a)(1) (2012). In order to have standing to sue as an "interested party" under this provision, a disappointed bidder must show that it suffered competitive injury or was "prejudiced" by the alleged error in the procurement process. See Todd Constr., L.P. v. United States, 656 F.3d 1306, 1315 (Fed. Cir. 2011) (To prevail, a bid protester must first "'show that it was prejudiced by a significant error' (i.e., 'that but for the error, it would have had a substantial chance of securing the contract).'" (quoting Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1378, 1380 (Fed. Cir. 2009))); see also Blue

& Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1317 (Fed. Cir. 2007); Sci. Applications Int'l Corp. v. United States, 108 Fed. Cl. 235, 281 (2012); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 693 (2010) ("In order to establish standing to sue, the plaintiff in a bid protest has always needed to demonstrate that it suffered competitive injury, or 'prejudice,' as a result of the allegedly unlawful agency decisions." (citing Rex Serv. Corp. v. United States, 448 F.3d 1305, 1308 (Fed. Cir. 2006); Statistica, Inc. v. Christopher, 102 F.3d 1577, 1580-81 (Fed. Cir. 1996); Vulcan Eng'g Co. v. United States, 16 Cl. Ct. 84, 88 (1988); and Morgan Bus. Assocs., Inc. v. United States, 223 Ct. Cl. 325, 332 (1980))). In order to establish what one Judge on this court has called "allegational prejudice" for the purposes of standing, the bidder must show that there was a "substantial chance" it would have received the contract award, but for the alleged procurement error. See Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. at 675; Hyperion, Inc. v. United States, 115 Fed. Cl. 541, 550 (2014) ("The government acknowledges that proving prejudice for purposes of standing merely requires 'allegational prejudice,' as contrasted to prejudice on the merits . . . ."); Bannum, Inc. v. United States, 115 Fed. Cl. 148, 153 (2014); see also Bannum, Inc. v. United States, 404 F.3d 1346, 1358 (Fed. Cir. 2005); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1331 (Fed. Cir.), reh'g denied (Fed. Cir. 2004); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); Statistica, Inc. v. Christopher, 102 F.3d at 1581; Archura LLC v. United States, 112 Fed. Cl. 487, 497 (2013); Lab. Corp. of Am. v. United States, 108 Fed. Cl. 549, 557 (2012). Because standing is a jurisdictional issue, this showing of prejudice is a threshold issue. See Corus Grp. PLC. v. Int'l Trade Comm'n, 352 F.3d 1351, 1357 (Fed. Cir. 2003); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002).

In a post-award bid protest, such as the above-captioned bid protest, the "protestor must 'establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest.'" Mgmt. & Training Corp. v. United States, 137 Fed. Cl. 780, 783-84 (2018) (quoting Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006)); see also Digitalis Educ. Sols., Inc. v. United States, 664 F.3d 1380, 1384 (Fed. Cir. 2012) (quoting MCI Telecomms. Corp. v. United States, 878 F.2d 362, 365 (Fed. Cir. 1989)); Timberline Helicopters, Inc. v. United States, No. 18-1474C, 2018 WL 4709765, at *2 (Fed. Cl. Oct. 2, 2018); Contract Servs., Inc. v. United States, 104 Fed. Cl. 261, 269 (2012).

Although "standing is not often discussed at length in CICA stay override cases," see PMTech, Inc. v. United States, 95 Fed. Cl. 330, 348 (2010), several Judges on the United States Court of Federal Claims have found that, by bidding on a procurement which was stayed pending a protest at the GAO, a protestor has enough of a direct economic interest in the stayed procurement and has standing to challenge an override of the CICA stay in this court. See Supreme Foodservice GmbH v. United States, 109 Fed. Cl. 369, 381 (2013) (evaluating the standing of a protestor challenging an override of the CICA stay and stating that, "[a]s an actual offeror challenging the award of a contract before the GAO, there is no question that Supreme [the protestor] is an interested party for purposes of our court's jurisdiction"); URS Fed. Servs., Inc. v. United States, 102 Fed. Cl. 664, 670 (2011) (determining that a protestor had standing to challenge an

override of a CICA stay implemented in connection with a bid protest at the GAO when the protestor had bid on the solicitation at issue at the GAO, notwithstanding that the protestor was not the incumbent contractor), <u>recons. denied</u>, 102 Fed. Cl. 674 (2012); <u>PMTech, Inc. v. United States</u>, 95 Fed. Cl. at 348; <u>Sierra Military Health Servs., Inc. v. United States</u>, 58 Fed. Cl. 573, 579 (2003).

In the above-captioned bid protest, Safeguard submitted a proposal in response to the Solicitation at issue in Safeguard's second post-award bid protest at the GAO. Pursuant to CICA, performance of the contract awarded to B&O following the Agency's evaluation of proposals received in response to the Solicitation was stayed until the Agency decided to override the CICA stay. Therefore, Safeguard, as an actual offeror, has a direct economic interest in the resultant contract issued under the Agency's Solicitation and has standing in the above-captioned bid protest to challenge the Agency's override of the CICA stay implemented when Safeguard filed its second post-award bid protest at the GAO. <u>See</u> <u>Supreme Foodservice GmbH v. United States</u>, 109 Fed. Cl. at 381; <u>URS Fed. Servs., Inc. v. United States</u>, 102 Fed. Cl. at 670.

When evaluating a challenge to an agency's decision to override an automatic CICA stay, Judges of the United States Court of Federal Claims have differed on whether the court should apply the test for injunctive relief or the test for a declaratory relief. <u>See</u> <u>Dyncorp Int'l LLC v. United States</u>, 113 Fed. Cl. 298, 307 (2013) ("This is a topic on which judges of this court have disagreed." (citations omitted)); <u>see also</u> <u>PMTech, Inc. v. United States</u>, 95 Fed. Cl. at 347 ("There is a split in the precedent of this court as to whether declaratory relief or injunctive relief should be afforded the successful protestor of a CICA stay override."). When evaluating challenges to an override decision, certain judges on the United States Court of Federal Claims have stated that utilizing the four-factor test for injunctive relief is more appropriate than the test for a declaratory judgment. <u>See</u> <u>Superior Helicopter LLC v. United States</u>, 78 Fed. Cl. 181, 194 (2007); <u>see also</u> <u>Reilly's Wholesale Produce v. United States</u>, 73 Fed. Cl. at 709 n.7. Other judges have indicated that declaratory relief is more appropriate because allowing "an arbitrary override to insert the injunctive relief requirements into the process would convert the CICA stay to something other than what Congress created." <u>See</u> <u>Supreme Foodservice GmbH v. United States</u>, 109 Fed. Cl. at 397; <u>see also</u> <u>Intelligent Waves, LLC v. United States</u>, 137 Fed. Cl. 623, 628 (2018) ("Because Congress provided the automatic stay as the default, it is not necessary that additional criteria be met to reinstate a stay that has been overridden by agency action."); <u>AT & T Corp. v. United States</u>, 133 Fed. Cl. 550, 557 (2017); <u>URS Fed. Servs., Inc. v. United States</u>, 102 Fed. Cl. 674, 676 (2012); <u>Nortel Gov't Sols., Inc. v. United States</u>, 84 Fed. Cl. 243, 252 (2008); <u>Advanced Sys. Dev., Inc. v. United States</u>, 72 Fed. Cl. 25, 36 (2006); <u>CIGNA Gov't Servs., LLC v. United States</u>, 70 Fed. Cl. 100, 114 (2006); <u>Chapman Law Firm Co. v. United States</u>, 65 Fed. Cl. 422, 424 (2005).

In the above-captioned bid protest, protestor's second motion for a temporary restraining order and a preliminary injunction requests that this court issue a temporary restraining order and a preliminary injunction. In protestor's amended complaint, in addition to requesting a preliminary injunction and a permanent injunction, protestor requests a declaration "that Defendant's decision to override the CICA stay issued in

connection with Safeguard's pending GAO protest award was arbitrary, capricious and contrary to law." In a previous, unrelated bid protest challenging an agency's decision to override a stay, in which the protestor requested both declarative and injunctive relief, the undersigned granted the protestor's request for a declaratory judgment and stated that "the override decision is set aside, and the automatic stay stemming from ATI's [the protestor's] GAO protest is reinstated." See Automation Techs., Inc. v. United States, 72 Fed. Cl. 723, 731 (2006). In a footnote, the undersigned stated that, "'[b]ecause the declaratory judgment will reinstate the stay and vacate the override, having the same effect as an injunction, the Court does not reach the issue of injunctive relief.'" Id. at 731 n.5 (quoting CIGNA Gov't Servs., LLC v. United States, 70 Fed. Cl. at 114). The court, however, need not determine, at this time, which form of relief is more appropriate in the above-captioned bid protest, because, as discussed below, the court finds that Safeguard's bid protest in this court is unlikely to succeed on the merits. See PMTech, Inc. v. United States, 95 Fed. Cl. at 347 ("In a case where the record does not support a finding that the agency's decision is arbitrary or capricious, however, the distinction between declaratory relief and injunctive relief is of little import."). In the current protest, Safeguard has requested injunctive relief and the court has analyzed this protest under the more rigorous injunctive relief standard.

Regarding protestor's request for a temporary restraining order and a preliminary injunction, the granting of a temporary restraining order "is an 'extraordinary and drastic remedy,'" GEO Grp., Inc. v. United States, 100 Fed. Cl. 223, 226 (2011) (quoting Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)), as is the granting of a preliminary injunction. See Silfab Solar, Inc. v. United States, 892 F.3d 1340, 1345 (Fed. Cir. 2018) ("A preliminary injunction 'is an extraordinary remedy.'" (quoting Winter v. Nat. Res. Def. Council, 555 U.S. 7, 24 (2008)). "The standards for determining whether to grant a temporary restraining order are the same as those that apply to a motion for a preliminary injunction." See Munilla Constr. Mgmt., LLC v. United States, 130 Fed. Cl. 131, 135 (2016); see also OAO Corp. v. United States, 49 Fed. Cl. 478, 480 (2001) ("When deciding if a TRO [temporary restraining order] is appropriate in a particular case, a court uses the same four-part test applied to motions for a preliminary injunction." (quoting W & D Ships Deck Works, Inc. v. United States, 39 Fed. Cl. 638, 647 (1997))).

To obtain a temporary restraining order or preliminary injunction, the protestor must carry the burden of establishing entitlement to extraordinary relief based on the following factors: (1) likelihood of success on the merits of the underlying litigation, (2) whether irreparable harm is likely if the injunction is not granted, (3) the balance of hardships as between the litigants, and (4) factors of the public interest. See Trebo Mfg., Inc. v. Firefly Equipment, LLC, 748 F.3d 1159, 1165 (Fed. Cir. 2014); see also Pharm. Research and Mfrs. of Am. v. Walsh, 538 U.S. 644, 670 (2003) (requiring a movant for preliminary injunction to prove that the "probability of success on the merits of its claims . . . the risk of irreparable harm, the balance of the equities, and the public interest" weigh in the movant's favor); Silfab Solar, Inc. v. United States, 892 F.3d at 1345 (citing Winter v. Nat. Res. Def. Council, 555 U.S. at 24); Abbott Labs. v. Sandoz, Inc., 544 F.3d 1341, 1344 (Fed. Cir. 2008) (citing Oakley, Inc. v. Sunglass Hut Int'l, 316 F.3d 1331, 1338-39 (Fed. Cir. 2003)), reh'g and reh'g en banc denied (Fed. Cir. 2009); Somerset

Pharms., Inc. v. Dudas, 500 F.3d 1344, 1346 (Fed. Cir. 2007) ("To establish entitlement to a preliminary injunction a movant must establish a reasonable likelihood of success on the merits." (citing Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd., 357 F.3d 1319, 1325 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2004))); U.S. Ass'n of Imps. of Textiles and Apparel v. U.S. Dep't of Commerce, 413 F.3d 1344, 1346 (Fed. Cir. 2005) (citing Zenith Radio Corp. v. United States, 710 F.2d 806, 809 (Fed. Cir. 1983)); Seaborn Health Care, Inc. v. United States, 55 Fed. Cl. 520, 523-24 (2003); Dynacs Eng'g Co. v. United States, 48 Fed. Cl. 614, 616 (2001).

The standard of proof required for a temporary restraining order and preliminary injunction is a preponderance of the evidence, Contracting Consulting Eng'g LLC v. United States, 103 Fed. Cl. 706, 709 (2012) (citing Bannum, Inc. v. United States, 60 Fed. Cl. 718, 723-24 (2004)); Bannum, Inc. v. United States, 60 Fed. Cl. at 723-24, or, demonstration of a fact as "more likely than not." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 329 (2007) (citing Herman & MacLean v. Huddleston, 459 U.S. 375, 390 (1983)).

> No one factor, taken individually, is necessarily dispositive. . . . [T]he weakness of the showing regarding one factor may be overborne by the strength of the others. If the injunction is denied, the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors.

FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993); see also Belgium v. United States, 452 F.3d 1289, 1292-93 (Fed. Cir. 2006); SVD Stars II, LLC v. United States, 138 Fed. Cl. 483, 486 (2018); Loch Harbour Grp., Inc. v. United States, 128 Fed. Cl. 294, 300 (2016).

In the above-captioned bid protest, Safeguard is challenging the Agency's decision to override the CICA stay that was implemented in connection with Safeguard's second post-award bid protest at the GAO. The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)–(4) (2012)), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330-32 (Fed. Cir. 2001); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380 (Fed. Cir. 2012) (explaining that the Tucker Act expressly waives sovereign immunity for claims against the United States in bid protests). The statute provides that protests of agency procurement decisions are to be reviewed under APA standards, making applicable the standards outlined in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. See, e.g., Per Aarsleff A/S v. United States, 829 F.3d 1303, 1309 (Fed. Cir. 2016) ("Protests of agency procurement decisions are reviewed under the standards set forth in the Administrative Procedure Act ('APA'), see 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706), 'by which an agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'" (quoting NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159

(Fed. Cir. 2004)) (citing <u>PAI Corp. v. United States</u>, 614 F.3d 1347, 1351 (Fed. Cir. 2010))); <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1332; <u>Res. Conservation Grp., LLC v. United States</u>, 597 F.3d 1238, 1242 (Fed. Cir. 2010) ("Following passage of the APA in 1946, the District of Columbia Circuit in <u>Scanwell Labs., Inc. v. Shaffer</u>, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district courts pursuant to the judicial review provisions of the APA."); <u>Galen Med. Assocs., Inc. v. United States</u>, 369 F.3d 1324, 1329 (Fed. Cir. 2004) (citing <u>Scanwell Labs., Inc. v. Shaffer</u>, 424 F.2d at 864, 868, for its "reasoning that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"); <u>Banknote Corp. of Am., Inc. v. United States</u>, 365 F.3d 1345, 1351 (Fed. Cir. 2004) ("Under the APA standard as applied in the <u>Scanwell</u> line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" (quoting <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1332)); <u>Info. Tech. & Applications Corp. v. United States</u>, 316 F.3d at 1319.

When discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, <u>see</u> <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1332 n.5, but focused its attention primarily on subsection (2)(A). <u>See Croman Corp. v. United States</u>, 724 F.3d 1357, 1363 (Fed. Cir.) ("'[T]he proper standard to be applied [to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (alterations in original) (quoting <u>Banknote Corp. of Am. v. United States</u>, 365 F.3d at 1350-51 (citing <u>Advanced Data Concepts, Inc. v. United States</u>, 216 F.3d 1054, 1057-58 (Fed. Cir.), <u>reh'g denied</u> (Fed. Cir. 2000)))), <u>reh'g</u> and <u>reh'g en banc denied</u> (Fed. Cir. 2013). The statute says that agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D) (2012);[10] <u>see also Tinton Falls</u>

---

[10] The language of 5 U.S.C. § 706 provides in full:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

Lodging Realty, LLC v. United States, 800 F.3d 1353, 1358 (Fed. Cir. 2015); Orion Tech., Inc. v. United States, 704 F.3d 1344, 1347 (Fed. Cir. 2013); COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012) ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A); and Bannum, Inc. v. United States, 404 F.3d at 1351)); Savantage Fin. Servs. Inc., v. United States, 595 F.3d 1282, 1285-86 (Fed. Cir. 2010); Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("'[T]he inquiry is whether the [government]'s procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Bannum, Inc. v. United States, 404 F.3d at 1351 (quoting 5 U.S.C. § 706(2)(A) (2000)))); NVT Techs., Inc. v. United States, 370 F.3d at 1159 ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000)." (internal citations omitted)); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); Synergy Sols., Inc. v. United States, 133 Fed. Cl. 716, 734 (2017) (citing Banknote Corp. of Am. v. United States, 365 F.3d at 1350); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 340 (2012). "In a bid protest

---

        (B) contrary to constitutional right, power, privilege, or immunity;

        (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

        (D) without observance of procedure required by law;

        (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

        (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d at 1351), reh'g en banc denied (Fed. Cir. 2011); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358 ("In applying this [arbitrary and capricious] standard to bid protests, our task is to determine whether the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of a regulation or procedure." (citing Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1285–86)); Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2013); Nat'l Gov't Servs., Inc. v. United States, 137 Fed. Cl. 715, 735 (2018) (quoting Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009)); McVey Co., Inc. v. United States, 111 Fed. Cl. 387, 402 (2013) ("The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law."); PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 531-32 ("Stated another way, a plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law." (citing Weeks Marine, Inc. v. United States, 575 F.3d at 1358)), subsequent determination, 96 Fed. Cl. 119 (2010).

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358; F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("[T]he agency tribunal must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform meaningful review . . . ."); Textron, Inc. v. United States, 74 Fed. Cl. 277, 285-86 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007). The United States Supreme Court also has cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor

Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1383; R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)); Synergy Sols., Inc. v. United States, 133 Fed. Cl. at 735 (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33). ""'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."'" Weeks Marine, Inc. v. United States, 575 F.3d at 1371 (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); Limco Airepair, Inc. v. United States, 130 Fed. Cl. 544, 550 (2017) (citation omitted); Jordan Pond Co., LLC v. United States, 115 Fed. Cl. 623, 631 (2014); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. 342, 349 (2013); Norsat Int'l [America], Inc. v. United States, 111 Fed. Cl. 483, 493 (2013); HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 238 (2012); Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 780 (2011).

Stated otherwise by the United States Supreme Court:

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) (internal citations omitted), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); see also U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6-7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law" standard, the Federal Circuit stated: "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); In re Sang Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993); By Light Prof'l IT Servs., Inc. v. United States, 131 Fed. Cl. 358, 366 (2017); BCPeabody Constr. Servs., Inc. v. United States, 112 Fed. Cl. 502, 508 (2013) ("The court 'is not empowered to substitute its judgment for that of the agency,' and it must uphold an agency's decision against a

challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" (internal citations omitted) (quoting Keeton Corrs., Inc. v. United States, 59 Fed. Cl. 753, 755, recons. denied, 60 Fed. Cl. 251 (2004); and Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381)), appeal withdrawn, 559 F. App'x 1033 (Fed. Cir. 2014); Supreme Foodservice GmbH v. United States, 109 Fed. Cl. at 382; Alamo Travel Grp., LP v. United States, 108 Fed. Cl. 224, 231 (2012); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 63 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002); Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. 388, 392 (1999) ("Courts must give great deference to agency procurement decisions and will not lightly overturn them." (citing Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985))), appeal dismissed, 6 F. App'x 867 (Fed. Cir. 2001), and superseded by regulation as recognized in MVS USA, Inc. v. United States, 111 Fed. Cl. 639 (2013).

According to the United States Court of Appeals for the Federal Circuit:

> Effective contracting demands broad discretion. Burroughs Corp. v. United States, 223 Ct. Cl. 53, 617 F.2d 590, 598 (1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69.

Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958-59; see also Res-Care, Inc. v. United States, 735 F.3d 1384, 1390 (Fed. Cir.) ("DOL [Department of Labor], as a federal procurement entity, has 'broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation.'" (quoting Tyler Constr. Grp. v. United States, 570 F.3d 1329, 1334 (Fed. Cir. 2009))), reh'g en banc denied (Fed. Cir. 2014); Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995 (Fed. Cir. 1996); Geo-Med, LLC v. United States, 126 Fed. Cl. 440, 449 (2016); Cybertech Grp., Inc. v. United States, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); Furthermore, according to the United States Court of Appeals for the Federal Circuit:

> Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted).

PAI Corp. v. United States, 614 F.3d at 1351; see also AgustaWestland N. Am., Inc. v.

United States, 880 F.3d 1326, 1332 (Fed. Cir. 2018) ("Where, as here, a bid protester challenges the procurement official's decision as lacking a rational basis, we must determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion,' recognizing that 'contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33 (internal quotation marks and citation omitted))); Weeks Marine, Inc. v. United States, 575 F.3d at 1368-69 ("We have stated that procurement decisions 'invoke [ ] "highly deferential" rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (alteration in original) (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058))).

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. See Tinton Fall Lodging Realty, LLC v. United Sates, 800 F.3d at 1364; see also Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995-96; Enhanced Veterans Sols., Inc. v. United States, 131 Fed. Cl. 565, 578 (2017); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. at 349; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 340. The Federal Circuit has indicated that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion . . . is not enough." PAI Corp. v. United States, 614 F.3d at 1352 (citing John C. Grimberg Co. v. United States, 185 F.3d 1297, 1300 (Fed. Cir. 1999)); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1387; Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 759 (2012); Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371, 380 (2004).

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351; T Square Logistics Servs. Corp. v. United States, Fed. Cl. 550, 555 (2017); FirstLine Transp. Sec., Inc. v. United States, 119 Fed. Cl. 116, 126 (2014), appeal dismissed (Fed. Cir. 2015); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Archura LLC v. United States, 112 Fed. Cl. at 496. To prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. See 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 907 ("In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial."); IT

Enter. Sols. JV, LLC v. United States, 132 Fed. Cl. 158, 173 (2017) (citing Bannum v. United States, 404 F.3d at 1357-58); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 694-96 (2010). In describing the prejudice requirement, the Federal Circuit also has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." Data General, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." Statistica, 102 F.3d at 1582; see CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award--that it was within the zone of active consideration.'") (citation omitted).

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir.), reh'g denied (Fed. Cir. 1999); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1326 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33; OMV Med., Inc. v. United States, 219 F.3d 1337, 1342 (Fed. Cir. 2000); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057; Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

In Data General Corp. v. Johnson, the United States Court of Appeals for the Federal Circuit wrote:

> We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract . . . . The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances. This is a refinement and clarification of the "substantial chance" language of CACI, Inc.-Fed. [v. United States], 719 F.2d at 1574.

Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir.), reh'g denied, en banc suggestion declined (Fed. Cir. 1996); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Bannum, Inc. v. United States, 404 F.3d at 1353, 1358 ("The trial court was required to determine whether these errors in the procurement

process significantly prejudiced Bannum . . . . To establish 'significant prejudice' Bannum must show that there was a 'substantial chance' it would have received the contract award but for the [government's] errors" in the bid process. (citing Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367; Statistica, Inc. v. Christopher, 102 F.3d at 1581; and Data Gen. Corp. v. Johnson, 78 F.3d at 1562); see also Todd Constr., L.P. v. United States, 656 F.3d 1306, 1315 (Fed. Cir. 2011); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057 (using a "reasonable likelihood" rule); Stratos Mobile Networks USA, LLC v. United States, 213 F.3d at 1380 (using a "substantial chance" test); Am. Corr. Healthcare, Inc. v. United States, 137 Fed. Cl. 395, 410 (2018) (using a "substantial chance" test); Vintage Autoworks, Inc. v. United States, 132 Fed. Cl. 143, 149 (2017) (using a "substantial chance" test); Active Network, LLC v. United States, 130 Fed. Cl. 421, 427 (2017) (using a "substantial chance" test); Archura LLC v. United States, 112 Fed. Cl. at 496 (using a "substantial chance" test); Info. Scis. Corp. v. United States, 73 Fed. Cl. 70, 96 (2006) (using a "substantial chance" test), recons. in part, 75 Fed. Cl. 406 (2007).

In the above-captioned bid protest, on September 25, 2018, Safeguard filed its second post-award bid protest at the GAO, in which Safeguard requested that "**GAO PROMPTLY NOTIFY DHS OF THE FILING OF THIS PROTEST AND THAT DHS BE DIRECTED TO STAY PERFORMANCE OF THIS AWARD UNTIL THIS PROTEST IS RESOLVED PURSUANT TO 4 C.F.R. § 21.6**." (capitalization and emphasis in original). On October 2, 2018, Robin Fowler, "Head of the Contracting Activity, Federal Law Enforcement Training Centers," issued the Agency's Determination and Findings for the override, which stated that the Agency was overriding the CICA stay "both based upon urgent and compelling circumstances that affect the interests of the United States and that it is also in the best interests of the United States."

Under CICA's automatic stay, agencies, upon receiving notice that the award is being protested, are to "direct the contractor to cease performance under the contract and to suspend any related activities that may result in additional obligations being incurred by the United States under that contract." See 31 U.S.C. § 3553(d)(3)(A)(ii)(2). CICA gives the Agency certain options to override a CICA stay, and, in the above-captioned bid protest, the Agency did so. CICA provides:

(C) The head of the procuring activity may authorize the performance of the contract (notwithstanding a protest of which the Federal agency has notice under this section)--

(i) upon a written finding that--

(I) performance of the contract is in the best interests of the United States; or

(II) urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the

Comptroller General concerning the protest; and

(ii) after the Comptroller General is notified of that finding.

31 U.S.C. § 3553(d)(3)(C).

Regarding override decisions, the United States Court of Appeals for the Federal Circuit has determined that "28 U.S.C. § 1491(b)(1) grants the trial court jurisdiction over an objection to a violation of 31 U.S.C. § 3553(c)(2)." RAMCOR Servs. Grp., Inc. v. United States, 185 F.3d 1286, 1290 (Fed. Cir. 1999); see also Dyncorp Int'l LLC v. United States, 113 Fed. Cl. at 302 ("We have jurisdiction under the Tucker Act, 28 U.S.C. § 1491(b) (2006), to review an agency decision to override a CICA stay." (citing RAMCOR Servs. Grp., Inc. v. United States, 185 F.3d at 1289-90)); Beechcraft Def. Co., LLC v. United States, 111 Fed. Cl. 24, 31 (2013); Supreme Foodservice GmbH v. United States, 109 Fed. Cl. at 381 ("Challenges to alleged violations of the CICA automatic stay provision are within this jurisdiction." (citing RAMCOR Servs. Grp., Inc. v. United States, 185 F.3d at 1290)).

Although not binding on this court, a template for evaluating an override determination was offered by a Judge of this court in Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705 (2006).[11] See Supreme Foodservice GmbH v. United States, 109 Fed. Cl. at 384 ("In Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705 (2006), one judge of our court surveyed the field of prior decisions and was able 'to distill from the relevant cases a variety of factors that an agency must consider in making an override decision.'" (quoting Reilly's Wholesale Produce v. United States, 73 Fed. Cl. at 711)); but see PMTech, Inc. v. United States, 95 Fed. Cl. at 343 ("The court in Reilly's Wholesale has provided excellent guidance to this court, and to the procurement community, in identifying factors that may be relevant to most CICA stay override decisions. As to the precedential weight to be accorded the Reilly's Wholesale factors, however, the court in this decision must express some reservations."). Override protests, however, are very fact specific inquiries. See PMTech, Inc. v. United States, 95 Fed. Cl. at 344 (quoting Automation Techs., Inc. v. United States, 72 Fed. Cl. at 727); Automation Techs., Inc. v. United States, 72 Fed. Cl. at 727, 730. As explained in Beechcraft Defense Co., LLC, the Reilly's Wholesale court identified four factors to consider:

(1) "whether significant adverse consequences will necessarily occur if the stay is not overridden"; (2) "whether reasonable alternatives to the override exist that would adequately address the circumstances presented"; (3) "how the potential cost of proceeding with the override, including the costs associated with the potential that the GAO might sustain the protest,

---

[11] As indicated by the same Judge who issued the Reilly's Wholesale decision, "'the decisions of this court are not binding precedent for judges of this court.'" Park Props. Assocs., L.P. v. United States, 120 Fed. Cl. 787, 790 (2015) (quoting Sotera Def. Solutions, Inc. v. United States, 118 Fed. Cl. 237, 258 (2014)), aff'd, 677 F. App'x 676 (Fed. Cir. 2017).

compare to the benefits associated with the approach being considered for addressing the agency's needs"; and (4) "the impact of the override on competition and integrity of the procurement system."

Beechcraft Defense Co., LLC v. United States, 111 Fed. Cl. at 31 (quoting Reilly's Wholesale Produce v. United States, 73 Fed. Cl. at 711); see also Supreme Foodservice GmbH v. United States, 109 Fed. Cl. at 384. The court in Reilly's Wholesale Produce further stated that the "decisional law also indicates that certain factors are irrelevant to this analysis, among them: (i) that the new contract would be better than the old one . . . or (ii) the override and continuation of the contract is otherwise simply preferable to the agency . . . ." Reilly's Wholesale Produce v. United States, 73 Fed. Cl. at 711.

In discussing Reilly's Wholesale, although a Judge of this court argued that "[t]he court's focus should be on whether the CICA stay override decision was rational and whether the agency considered relevant factors, not on whether the agency conformed its analysis to a specific framework elaborated by this court," the Judge, nonetheless acknowledged "the court recognizes the utility of the analytical framework provided by Reilly's Wholesale, but does not consider that the Reilly's Wholesale factors govern the outcome of this case." PMTech, Inc. v. United States, 95 Fed. Cl. at 345. Likewise, the undersigned is not bound by the Reilly's Wholesale factors, but believes the factors are a useful tool to help analyze the Agency's decision to override the automatic stay based on urgent and compelling circumstances in the context of APA review. See 5 U.S.C. § 706(2)(A).

The court in Reilly's Wholesale Produce v. United States set forth an analytical framework that was based on "a variety of factors that an agency must consider in making an override decision based upon urgent and compelling circumstances."[12] Reilly's Wholesale Produce v. United States, 73 Fed. Cl. at 711. The factors articulated in Reilly's Wholesale Produce v. United States "have been applied when the stay override is based upon urgent and compelling circumstances, or based upon the best interests of the United States."[13] Charles F. Day & Assocs., LLC v. United States, 120 Fed. Cl. 767, 771 (2015);

---

[12] In a footnote, the court in Reilly's Wholesale Produce v. United States stated:

> Admittedly, some of the cases cited for the factors that are legally relevant and irrelevant in this context are ones in which the agency override decision was based upon the "best interests" of the United States. However, in the court's view, the rationale employed in those cases has, where indicated, application to the review of an override decision based upon urgent and compelling circumstances.

Reilly's Wholesale Produce v. United States, 73 Fed. Cl. at 711 n.10.

[13] In Dyncorp Int'l LLC v. United States, a Judge of the United States Court of Federal Claims declined to apply the factors set forth in Reilly's Wholesale Produce v. United States to an agency's override of the CICA stay "in the context of a 'best interest' justification." See Dyncorp Int'l LLC v. United States, 113 Fed. Cl. at 303 n.4. The Dyncorp

see also Supreme Foodservice GmbH v. United States, 109 Fed. Cl. at 384 (noting that the factors articulated in Reilly's Wholesale Produce v. United States "have been employed in cases reviewing overrides based on either justification"); E-Mgmt. Consultants, Inc. v. United States, 84 Fed. Cl. 1, 6 (2008) (applying the Reilly's Wholesale Produce v. United States factors to an agency's decision to override the CICA stay, in which the agency justified the override decision as being in the "best interests of the United States"). The undersigned is not bound by the Reilly's Wholesale factors when evaluating the Agency's best interests justification for overriding the CICA stay, but believes that the Reilly's Wholesale factors are a useful analytical tool for evaluating whether the Agency's best interests justification was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." See 5 U.S.C. § 706(2)(A).

In Safeguard's second motion for a temporary restraining order and preliminary injunction, Safeguard asserts that "Safeguard is extraordinarily likely to succeed on the merits of this challenge." Safeguard asserts that "[r]elevant case law clarifies that, in the context of an 'urgent and compelling' justification, 'adverse consequences' are those giving rise to a 'threat of immediate harm to health, welfare, or safety.'" (citing Supreme Foodservice GmbH v. United States, 109 Fed. Cl. at 387). Safeguard contends that the Agency has failed to show any adverse consequences because

> DHS' primary reasoning is that any delay in performance of B&O's contract *might* lead to the cancellation of certain classes at FLETC, which *could* lead to less expertise among law enforcement personnel. Respectfully, this chain-link of alleged possible consequences facially does not reflect a threat of *immediate* harm to health, welfare, or safety.

(emphasis in original). Safeguard asserts that, "[e]ven assuming, *arguendo*, that the D&F alleges legally sufficient 'urgent and compelling circumstances,' the D&F fails because any adverse consequences are of DHS' own making in failing to extend SRM's performance." (emphasis in original).

Safeguard also argues that "[t]here is no support for the D&F's assertion that a further bridge contract would not be 'feasible or proper.'" (internal reference omitted). According to Safeguard, the Agency did not "even attempt to quantify the economic harm to DHS if Safeguard's GAO protest is sustained," but only asserted that, "in Mr. Caine's opinion, DHS will win the protest." Regarding the Agency's position that overriding the CICA stay in the above-captioned bid protest was in the "best interests" of the United States, Safeguard argues that the costs savings identified in the Agency's Determination and Findings is "mathematically erroneous." In support of its position that the costs

---

Int'l LLC court stated that the Reilly's Wholesale Produce v. United States test "overstates what is required by the arbitrary and capricious standard particularly in the context of a 'best interest' justification." See id. The Dyncorp Int'l LLC court stated that the "test for evaluating the merits of an agency's override decision is whether the agency's determination was arbitrary, capricious, or otherwise not in accordance with law." Id. at 302 (footnote omitted) (citing 5 U.S.C. § 706 (2012)).

savings are incorrect, Safeguard cites to the October 2, 2018 declaration signed by Suresh S. Prabhu, who alleges that the amount B&O is billing the Agency for dormitory maintenance services "is **higher** than what SRM has been charging under its recent extension contracts and would be charging had DHS issued a further bridge contract." (emphasis in original). Additionally Safeguard argues that, "[p]erhaps more important, case law from this Court clarifies that an agency cannot justify a CICA override based on the 'best interests of the United States' by relying on an alleged cost difference of this sort." (citing Advanced Sys. Dev., Inc. v. United States, 72 Fed. Cl. at 31). According to Safeguard, the October 2, 2018 Determination and Findings does not address the impact of overriding the CICA stay on the integrity of the procurement system because "there is no reasonable argument that DHS' conduct benefits the procurement system and protects CICA's important goals. It plainly does the opposite."

Safeguard argues that Safeguard will be irreparably harmed if injunctive relief is not granted because "SRM's contract with FLETC is 'SRM's largest source of revenue' and 'the immediate loss of SRM's major source of revenue will further prejudice Safeguard if it is required quickly, and expensively, to hire new employees for this work following a reversal of DHS' award decision in favor of B&O.'" (quoting the September 28, 2018 declaration signed by Suresh S. Prabhu). Safeguard contends that the harm to Safeguard outweighs the harm to the Agency and B&O because "DHS already has executed several contract extensions with SRM for the services in question," and,

> critically, DHS and B&O have represented to this Court that the transition to B&O took place virtually overnight on Sunday, September 30, 2018. Accordingly, DHS and B&O must concede that B&O's transition just as readily could be unwound, and that Safeguard could transition back if and when this Court enjoins performance of B&O's protested contract.

Safeguard further contends that the issuance of a temporary restraining order or a preliminary injunction is in the public interest because the public interest would be served if the Agency was permitted to ignore the "important statutory mandate" in CICA.

Defendant, however, contends that "the record shows that FLETC had a rational basis for finding urgent and compelling circumstances to override the CICA stay." According to defendant, the Determination and Findings identified significant adverse consequences that would result if the Agency did not override the CICA stay because "Mr. Walters [in his role as Director of FLETC] testified that any reduction in FLETC's training capacity and output of fully trained and qualified officers and agents translates directly into federal law enforcement agencies not having fully trained personnel to conduct law enforcement functions critical to the safety and security of our nation." Defendant argues that "Mr. Walters confirmed that 'FLETC simply does not have adequate resources to replace all of the services provided by the contract,'" and that, "[b]ecause FLETC is fully booked for the entire year, 'a slowdown in current training means that some quantity of training already scheduled for the fiscal year would be displaced.'" (quoting the October 1, 2018 affidavit signed by Thomas J. Walters). According to defendant, "Mr. Walters concluded that 'delaying the deployment of new

federal law enforcement personnel to their duty stations because they were not able to receive required basic training creates a significant risk to public safety and security.'" Defendant notes that, "on four separate occasions, in connection with justifying sole-source procurement actions (to SRM's benefit) made 'unusual and compelling urgency' determinations with respect to the services at issue."

Defendant asserts that the Agency "had no reasonable alternatives" to overriding the CICA stay because SRM Group's contract for dormitory maintenance services with the Agency had expired in 2017 and, as the October 2, 2018 Determination and Findings indicates, a "further bridge contract [was] not possible." Defendant, however, also contends that the Agency was not required to award SRM Group a bridge contract, and that the Agency could not award a bridge contract for dormitory maintenance services because "there was no time to comply with the congressional 5-day notification requirement given the filing of SBO's second protest on September 25, 2018 and the expiration of SRM's bridge contract on September 30, 2018." Defendant asserts that "the only contract vehicle that was available was the newly-awarded contract to B&O, for which FLETC already had provided the requisite Congressional notification." Defendant also asserts that, in the Determination and Findings, the Agency considered Safeguard's second post-award bid protest and "correctly determined that there was little potential cost of proceeding with the override." According to defendant:

> SBO asserts that because FLETC previously considered its incomplete proposal, it is precluded now from determining the proposal should have been excluded. In fact, the error that SBO noted in its first post-award protest filed on August 20, 2018, was that FLETC improperly adjusted SBO's prices in part to add in those missing CLINs. SBO was correct that it was improper for the agency to adjust SBO's prices after its price realism analysis, an adjustment prohibited in competitions for firm fixed prices by FAR 15.404-1(d)(3). FLETC promptly took corrective action. In its reevaluation, recognizing that due to SBO's August 2018 protest that the agency was powerless to adjust SBO's proposed price for failure to include the not-to-exceed amounts for CLINs XX7AA and XXX7AA, FLETC properly determined that it could not consider the proposal for award. Now, in its September 25, 2018, protest, SBO complains that it was improper for FLETC to not adjust its prices.

(emphasis in original).

Defendant further contends that the Determination and Findings did consider the integrity of the procurement system and explained "that allowing B&O, an 8(a) contractor twice awarded this contract, to proceed is preferable to issuing a fifth FAR 6.302-3 J&A in support of keeping in place a non-8(a) contractor whose contract expired 15 months ago (9 months ago if you include the FAR 52.217-8 option)." Defendant asserts that Safeguard has not established irreparable harm because

"the evidentiary record in this case makes clear that the stay of performance

that [SBO] seeks here would leave [SBO] in exactly the same position that [SBO] would be in if the Court were to deny the requested relief, [SBO] is and would remain an unsuccessful offeror for a contract [sic] has been previously awarded to [B&O]."

(first, second, third, fourth, and sixth alteration added by defendant) (quoting Treadwell Corp. v. United States, 133 Fed. Cl. 371, 383 (2017), aff'd, 726 F. App'x 826 (Fed. Cir. 2018)).

Defendant-intervenor, B&O, asserts that the Agency's decision to override the CICA stay was "proper under both the urgent and compelling circumstances and the best interest justifications." Defendant-intervenor argues that the Agency had no reasonable alternative to overriding the CICA stay because "there was no time to comply with the Congressional notification requirement before services were required," and, "had FLETC attempted to extend SRM's performance by a fifth FAR 6.302-2 action, that determination would have been subject to challenge given that there were qualified 8(a) companies ready and able to perform that work. Not only was it not possible, it was not required." Defendant-intervenor also argues that the Agency's "override was in the best interests of the Government" because:

[A] stay of performance would have had the adverse consequences noted in the Affidavit from FLETC's Director supporting the override determination, including the "significant potential" for consequences "affecting the national security of the Nation," FLETC's best interests justification for the override was more than sufficient. Plaintiff's argument that other stated reasons for the override in the D&F are lacking – that Intervenor's firm fixed monthly price of [redacted] is lower than the price of Plaintiff's minority owner, or because FLETC did not feel it appropriate to have a non-8(a) continue to perform an 8(a) requirement does not change the fact that FLETC's need to avoid the service interruption that would have resulted from the implementation of the stay was a sufficient basis for its action.

Regarding plaintiff's request for a temporary restraining order and preliminary injunction, defendant-intervenor asserts:

Plaintiff's claim of harm it would suffer should an injunction not be issued is flawed for three reasons: (1) it muddles economic harm it may suffer with harm that SRM may suffer, (2) confuses harm that would be caused by the end of SRM's contract with harm, if any, caused if the override decision is not enjoined, and (3) claims harm it would incur should it not be awarded the contract. Those harms are not relevant to the question of whether the Plaintiff will suffer harm if the override is not enjoined.

(emphasis in original). Additionally, defendant-intervenor contends that "it is clear that imposing an injunction that required FLETC to halt performance or to reinstall SRM, in

addition to being unsupported, would cause greater harm to the Government and the Intervenor than allowing Intervenor to continue performing would cause to Plaintiff" because of the "interruption" an injunction would have on "this important work."

In the Agency's October 2, 2018 Determination and Findings, Robin D. Fowler states:

> Upon the basis of the following findings, I, Robin D. Fowler, Head of the Contracting Activity, Federal Law Enforcement Training Centers (FLETC), have determined that performance of the contract for Dorm Management Services in support of FLETC Glynco is authorized to proceed in the face of a Government Accountability Office *(GAO)* protest (B-415588) filed by Safeguard Base Operations, LLC (SBO) as continuing performance is both based upon urgent and compelling circumstances that affect the interests of the United States and that it is also in the best interests of the United States.

(emphasis in original).

Under a heading titled "Existing Contract and Protest," Ms. Fowler recounts the history of SRM Group's provision of dormitory maintenance services to the Agency. Ms. Fowler notes that the period of performance under the original SRM Group Contract, as awarded on June 28, 2012, began on July 1, 2012 and ended on June 30, 2017. Ms. Fowler states that "FAR clause 52.217-8 Option to Extend Services was in the [SRM Group] contract and FLETC exercised it, thus extending the period of performance an additional six months to December 31, 2017." Ms. Fowler notes that SRM Group's performance was extended for a second time when, on November 2, 2017, the Agency had issued a Justification and Approval pursuant to FAR § 6.302-2 stating that the Agency was entering "into a six month contract extension on a basis of other than full and open competition beyond the current contract period" to December 31, 2017. The November 2, 2017 Justification and Approval alleges that "Dorm Management Services are critical to sustain FLETC's ability to train the Federal Law Enforcement Officers. This contract extension will maintain contract support until a new contract can be awarded." Ms. Fowler references that SRM Group's performance was extended for a third time on June 22, 2018, when the Agency had issued another Justification and Approval pursuant to FAR § 6.302-2 on the basis of unusual and compelling urgency. The June 22, 2018 Justification and Approval states that the Agency was "[e]xtending the period of performance" for the SRM Group Contract to July 31, 2018 and indicates that "[a] lapse in contract support would present an unacceptable risk to the FLETC. Should these critical services become unavailable, it would have a major, negative impact on the ability of the FLETC to provide critical training to approximately 95 federal agencies partnered with the FLETC."

In the October 2, 2018 Determination and Finding, Ms. Fowler discusses that, on July 27, 2018, the Agency extend SRM Group's performance for a fourth time. The July 27, 2018 Justification and Approval "extend[ed]" SRM Group's performance until August

31, 2018 on the basis of other than full and open competition because of unusual and compelling circumstances under FAR § 6.302-2. In the July 27, 2018 Justification and Approval, the Agency again stated that a lapse in dormitory maintenance services would pose an unacceptable risk to the Agency and would have a "major, negative impact on the ability of the FLETC to provide critical training." Ms. Fowler also notes that the Agency "extend[ed]" SRM Group's performance for a fifth time on August 29, 2018 when the Agency had issued a fourth Justification and Approval pursuant to FAR § 6.302-2 on the basis of unusual and compelling urgency. In the August 29, 2018 Justification and Approval, the Agency, once again, stated that a potential lapse in dormitory maintenance services posed an unacceptable risk to the Agency, and that a lapse in services would negatively impact the Agency's ability to train federal law enforcement officers. Thus, Ms. Fowler notes that the Agency had extended the period of SRM Group's performance of dormitory maintenance services five times, once under FAR § 52.217-8 and four times through Justifications and Approvals on the basis of other than full and open competition because of unusual and compelling urgency under FAR § 6.302-2. In total, the Agency utilized FAR § 52.217-8 and FAR § 6.302-2 to prolong SRM Group's performance from June 30, 2017 to September 30, 2018.

Regarding SRM Group's performance under the four Justifications and Approvals, in the October 2, 2018 Determination and Findings, Ms. Fowler states that:

> In August, 2018, I learned from counsel, that the interested party's attorneys had objected to and expressed concern that the bridge contracts that FLETC executed to obtain services during the protest, were obtained from a contractor who was not in the 8A program and the acquisition was in the 8A program. Although, a standard practice at FLETC during protests was awarding bridge contracts to the incumbent, I realized that this was not a good practice in this case, and was contrary to my obligation to comply with and fully support the Small Business Administration's 8A program. This lead to my decision to not award a new bridge contract to any contractor outside the 8A program. It takes a total of five days to complete the congressional notification process required for new awards in excess of one million dollars. Thus, it was impossible to prepare and award a bridge contract to the awardee for just the 120-day period required to complete the GAO protest process in time to avoid doing without these services and jeopardizing training. Therefore, I had no choice but to override the Stay to ensure continued performance.

The Agency's Urgent and Compelling Circumstances Justification

In a subsection of the October 2, 2018 Determination and Findings with a label indicating that "**Urgent and Compelling circumstances that significantly affect the interests of the United States that will not permit waiting for the GAO decision on the merits of the protest**," the October 2, 2018 Determination and Findings states:

The current contract has been extended several times beyond what is

normally allowed by the Extension of Services clause FAR 52.212-8 [sic]. Each extension has been a separate contract action supported by a Justification and Approval (J&A) authorizing the continuation of services under the status quo requirements. However, the incumbent contractor, SRM Group, Inc., is no longer an 8(a) contractor, having graduated approximately two years ago. Therefore, it is no longer feasible or proper to continue services under the current contract to a contractor who is not even an 8A contractor, and the only other option vice an override is to forego these vital services throughout the GAO protest period. The impacts, as described in the affidavit of Thomas J. Walters, Director of FLETC, would be as follows:

> 1) Adversely impact FLETC training operations and could potentially lead to classes being cancelled due to lodging disruption;
> 2) Could cause training to be unaffordable for our Partner Organizations as we would attempt to use off-center lodging and it would be much more expensive, and in some cases the Director believes they would pull students from training as it would be unaffordable;
> 3) Due to upcoming CBP and ICE surge any disruption to lodging at a time when we are looking for greater lodging capacity by double bunking and more aggressive commercial lodging could jeopardize ability to meet the requirements of the surge;
> 4) FLETC has limited staff and equipment resources and it is not clear we could adequately clean common areas, issue keys, and maintain the buildings adequate to meet health and safety needs which may well result in the loss of the use of these dormitories even if we required students to clean their own linens and rooms. Taking these steps would negatively impact training as our training program is demanding, and does not have student time included in the training schedule for room and linen cleaning.

(emphasis in original). According to Ms. Fowler, "FLETC's Chief Financial Officer informed me [Ms. Fowler] the impact of replacing on-center lodging with off-center lodging, assuming adequate off-center lodging was even available, would be approximately $20 million over the course of a 120-day extension."

In the October 1, 2018 affidavit signed by Thomas J. Walters,[14] which is cited as support in the October 2, 2018 Determination and Findings, Mr. Walters, the Director of FLETC, states:

---

[14] Safeguard's October 4, 2018 second motion for a temporary restraining order and a preliminary injunction and defendant's and defendant-intervenor's October 15, 2018 responses were filed before defendant filed the administrative record in the above-captioned bid protest on October 16, 2018. Defendant included in the administrative record the October 1, 2018 affidavit signed by Thomas J. Walters, as well as the October 12, 2018 supplemental affidavit signed by Thomas J. Walters. Safeguard has not objected to the inclusion of the affidavits signed by Thomas J. Walters in the administrative record.

In Fiscal Year 2017, FLETC provided at its Glynco site basic qualification training to over 16,000 Federal law enforcement officer and agent trainees, and advanced training to almost 15,000 students. Additionally, FLETC has begun planning efforts to meet the anticipated surge in training that CBP and ICE will require to meet the hiring goals associated with Executive Order 13767, *Border Security and Immigration Enforcement Improvements,* and Executive Order 13768, *Enhancing Public Safety in the Interior of the United States*. To meet the intents of these Executive Orders, CBP will hire 5,000 Border Patrol Agents and ICE will hire 10,000 Immigration Officers; FLETC will be responsible for training almost all of them.

These extremely high training levels significantly exceed our on-Center lodging capacity of just over 2,000 dormitory rooms/bed spaces. We are attempting to increase our capacity by double-bunking many dormitory rooms.

\* \* \*

It would be impossible to make up for the loss of these dormitories through hotels or other commercial lodging. FLETC has completely exhausted local lodging options at our current level of training with all dormitories operational. The budgetary constraints associated with attempting to house additional students in commercial lodging would likely compel some of our Federal partners to cancel training due to the increased costs associated with off-Center lodging and transportation. Furthermore, utilizing lodging in excess of 70 miles from FLETC would cause some of our Federal partners to cancel training. Because FLETC is at full capacity for the entire training year - and, in fact, has already informed some Federal partner agencies that we could not support the entirety of their training requests - any training cancelled could not be rescheduled for at least a year.

In the October 12, 2018 supplemental declaration signed by Thomas J. Walters,[15] Mr. Walters states:

---

[15] In the October 12, 2018 supplemental affidavit signed by Thomas J. Walters, Mr. Walters states that "[t]his affidavit is not intended to contradict or in any way diminish my previous affidavit. I prepared this supplemental affidavit to specifically clarify the catastrophic harm that would result to the United States if the Court enjoins performance of the FLETC's Housing Maintenance contract." In the October 12, 2018 supplemental affidavit signed by Mr. Walters, Mr. Walters restates many of the conclusions Mr. Walters reached in his October 1, 2018 affidavit, but further discusses the actions that the Agency would take if the court were to issue an injunction in the above-captioned bid protest, as well as the anticipated demands of the Agency's federal agency partners in Fiscal Year 2019.

FLETC's federal partners come from all 15 Cabinet-level departments, as well as legislative branch and judicial branch organizations, independent agencies, government corporations, and commissions. When they send personnel for basic training at FLETC, they expect fully trained law enforcement officers and agents to be ready for operations on their planned graduation dates. Delays in training these personnel thus create personnel deficits with the potential to impact the broad spectrum of federal law enforcement activities in the United States. This would include, but is not limited to, border security, apprehending violent fugitives, protecting our Nation's leaders and diplomats, aviation security, securing the U.S. Capitol and numerous other federal buildings, investigating drug crimes, patrolling our national parks, and other law enforcement operations that are critical to public safety and security.

* * *

Any reduction in FLETC's training capacity and output of fully trained and· qualified officers and agents translates directly into federal law enforcement agencies not having fully trained personnel to conduct law enforcement functions critical to the safety and security of our nation's communities and people. Failure to replace the retiring officers would severely limit the ability of Federal law enforcement agencies to safeguard Federal property and personnel and to enforce the law in the National Parks. Agencies such as the Capital Police, Federal Protective Service, the Secret Service agents and uniformed officers, and United States Marshals, along with numerous other agencies, all train at FLETC. Any reduction in the output of the FLETC training pipeline of trained law enforcement officers to replace the officers leaving these agencies would jeopardize health and safety by resulting in less officers. This could affect the security of Federal buildings, courthouses and the National Parks. This does not even address the draconian consequences along the United States border that could result as FLETC would not be able to respond to the anticipated surge directed by the Executive Orders, as discussed in my previous affidavit.

As in the October 1, 2018 affidavit, Mr. Walters again states in the October 12, 2018 supplemental affidavit that, even if students were required to perform some dormitory maintenance services, the Federal Law Enforcement Training Center in Glynco, Georgia, still would not have adequate staff to complete all of the necessary dormitory maintenance services. According to the October 12, 2018 supplemental affidavit, the Federal Law Enforcement Training Center's Mission Readiness and Support Directorate "is not staffed for this additional work and is fully engaged with the duties for which they were hired."

The October 2, 2018 Determination and Findings and the affidavits signed by Thomas J. Walters indicate that, if the Agency does not have a contractor providing dormitory maintenance services while Safeguard's second post-award bid protest is pending at the GAO, which may be pending until January 3, 2019, the Agency will be

unable to continue training a sufficient number federal law enforcement officers and will not be able to house all of its students on site in Glynco, Georgia. By not operating at its full capacity, the Federal Law Enforcement Training Center in Glynco, Georgia, will have to cancel training sessions for federal law enforcement officers. According to the October 1, 2018 affidavit signed by Thomas J. Walters, "FLETC is at full capacity for the entire training year," and "any training cancelled could not be rescheduled for at least a year." Any cancellation of training for federal law enforcement students, therefore, would result in federal agencies being unable to meet their demands for qualified, trained federal law enforcement officers, which would undermine the ability of federal agencies to field the necessary number of federal officers.

The Agency indicates that, without a contractor providing dormitory maintenance services, the Agency would have to outsource some of its lodging requirements to commercial providers, which would increase the costs of training federal law enforcement officers. The October 2, 2018 Determination and Findings indicates that the cost of outsourcing lodging to commercial providers would be "approximately $20 million over the course of a 120-day extension." The increased costs of training would be passed onto federal agency partners, and, because outsourcing lodging requirements to commercial providers increases the cost of training, federal agencies will be unable to afford to train a sufficient number of new officers. The October 1, 2018 affidavit signed by Thomas J. Walters indicates that, by training fewer federal law enforcement officers, there will not be enough trained federal officers to meet the demands of federal agencies, "thereby effecting the national security of the Nation." Moreover, the October 2, 2018 Determination and Findings and the October 1, 2018 affidavit signed by Thomas J. Walters indicate that the demands of federal agencies have increased in connection with the issuance of several Executive Orders. According to the October 12, 2018 affidavit signed by Mr. Walters, the Agency trained more than 20,000 recruits in Fiscal Year 2018, and, "[f]or FY [fiscal year] 2019, FLETC expects this demand to exceed its capacity in terms of facilities and instructor resources."

If the Agency was not able to acquire dormitory maintenance services covering the duration of Safeguard's second post-award bid protest at the GAO after SRM Group's performance was complete on September 30, 2018, the Agency's ability to produce qualified, trained federal law enforcement officers would have been greatly diminished. Without a contractor providing dormitory maintenance services, the Agency would have been unable to meet its current training schedule as previously established with federal agencies, and federal agencies would have received less trained federal law enforcement officers than anticipated. As indicated in the October 12, 2018 supplemental affidavit signed by Thomas J. Walters, the inability of the Agency to meet the demands of federal agency partners limits "the ability of Federal law enforcement agencies to safeguard Federal property and personnel and to enforce the law in the National Parks." The consequences of forgoing dormitory maintenance services while Safeguard's second post-award bid protest is resolved at the GAO until January 3, 2019 would be significant and adverse and would negatively impact the pool of trained federal law enforcement officers available for use by federal agencies. According to the October 12, 2018 supplemental affidavit signed by Thomas J. Walters, in Fiscal Year 2018, the Agency's

contractor, in addition to providing dormitory maintenance services, was responsible for "in-processing on average 375 arriving students in a given week," and requiring "the students to clean their own rooms, clean the dormitory common areas, wash their own linen, and assist in controlling key distribution" would "result in a longer training day and would necessarily force the pace of training to slow down." The Agency also has insufficient staff to provide the required dormitory maintenance services itself, for which the Agency currently appears to be paying approximately $900,000.00 per month to B&O.

Indeed, the Agency had previously recognized the importance of dormitory maintenance services when the Agency issued four Justifications and Approvals to SRM Group, which authorized the continuation of dormitory maintenance services beyond the expiration of the final option period of performance in the SRM Group Contract, as awarded on June 28, 2012. Each of the four Justifications and Approvals asserted that the need for continued dormitory maintenance services was an unusual and compelling need and utilized other than full and open competition procedures under FAR § 6.302-2. The four Justifications and Approvals identified dormitory maintenance services as being critical to the Agency's mission and indicated, "[s]hould these critical services become unavailable, it would have a major, negative impact on the ability of the FLETC to provide critical training to approximately 95 federal agencies partnered with FLETC." The four Justifications and Approvals issued to continue SRM Group's provision of dormitory maintenance services are consistent with the court's conclusion that the Agency would suffer significant adverse consequences if the Agency did not obtain dormitory maintenance services during the balance of Safeguard's second post-award bid protest at the GAO.

As to whether there were reasonable alternatives to overriding the CICA stay, the Agency first received notice of Safeguard's second post-award bid protest on Tuesday, September 25, 2018, when Safeguard filed its second post-award bid protest at the GAO. As of September 25, 2018, the Agency had approximately five days to determine how to proceed, before SRM Group's performance under the fourth Justification and Approval pursuant to FAR § 6.302-2 on the basis of unusual and compelling urgency was scheduled to end on Sunday, September 30, 2018 and dormitory maintenance services performance would come to an end.

The last option period of performance in SRM Group's contract with the Agency, as awarded on June 28, 2012, had been set to expire on June 30, 2017, but the Agency, prior to the end of the SRM Group Contract, issued two three-month extensions of SRM Group's contract under FAR § 52.217-8. Thereafter, the Agency could not further extend SRM Group's performance under FAR § 52.217-8 because "the total extension of performance" under FAR § 52.217-8 cannot exceed six months. See FAR § 52.217-8. The Agency, however, had issued four Justifications and Approvals pursuant to FAR § 6.302-2 that, collectively, continued SRM Group's performance from December 31, 2017 to September 30, 2018.[16]

---

[16] According to defendant, the Agency's Justifications and Approvals under FAR § 6.302-2 were "sole-source contract actions" that "were justified by urgent and compelling circumstances." Defendant-intervenor argues that the Agency's Justifications and

At the October 17, 2018 oral argument, counsel of record for Safeguard asserted that, as an alternative to overriding the CICA stay, the Agency could have awarded a sole-source bridge contract to SRM Group. The October 2, 2018 Determination and Findings indicates that Ms. Fowler did consider awarding a bridge contract to SRM Group for dormitory maintenance services, which, presumably, would have been issued pursuant to FAR § 6.302-2 on the basis of unusual and compelling urgency, under which the previous four Justifications and Approvals had been issued. Ms. Fowler, however, stated that:

> It takes a total of five days to complete the congressional notification process required for new awards in excess of one million dollars. Thus, it was impossible to prepare and award a bridge contract to the awardee for just the 120-day period required to complete the GAO protest process in time to avoid doing without these services and jeopardizing training.

Ms. Fowler's statement in the October 2, 2018 Determination and Findings appears to be referencing a requirement in the DHS Acquisition Manual (HSAM) (2018)[17] at Section 3005.303-70, which is titled "Congressional notification of contract actions." HSAM § 3005.303-70 states that the "Congressional notification requirements are required by the Consolidated Appropriations Act, which is appropriations law." See HSAM § 3005.303-70(a). DHS contracting officers are required to "prepare and electronically submit the Congressional notification" to the DHS Office of Legislative Affairs at "least five (5) full business days prior to the anticipated award or notice of award per Appendix D. (i) The business day begins at 9:00 a.m. Eastern Time (ET). For notifications received after 9:00 a.m. ET, the first full business day will be the day following receipt." See HSAM § 3005.303-70(d). Appendix D of the HSAM states that Congressional notification is required for "a new contract award with a total contract value (i.e. base and all option quantities or periods) exceeding $1M," as well as "a modification exceeding $1M (excluding option exercises)." "[C]ontract actions" identified in Appendix D, which include both new awards and modifications exceeding $1,000,000.00, "shall not be awarded, issued or distributed, nor information released to sources outside of DHS (except as described in FAR 15.503(a)(1)), until the requirements of Appendix D and this subsection have been satisfied." See HSAM § 3005.303-70(b).

If the Agency had opted to award a sole-source bridge contract to SRM Group covering the period of October 1, 2018 to January 3, 2019, the bridge contract is described as being in excess of $1,000,000.00, as SRM Group's most recent three one-month periods of performance under FAR § 6.302-2 were awarded at a value of

---

Approvals under FAR § 6.302-2 were "authorized based on FLETC's determination that unusual and compelling urgency supported sole-source contract actions."

[17] The HSAM is updated multiple times per year. See HOMELAND SECURITY ACQUISITION MANUAL, https://www.dhs.gov/publication/hsam (last visited Oct. 24, 2018). The version of the HSAM that was in effect when the Agency issued its October 2, 2018 Determination and Findings was issued on June 29, 2018. See id.

$778,975.33, $882,537.69, and $996,416.13, respectively. As such, the bridge contract would have required Congressional notification, as well as internal pre-notification actions within the Agency. Because Safeguard filed its second post-award bid protest at the GAO on Tuesday, September 25, 2018, Ms. Fowler correctly noted that the Agency could not have completed the five-day Congressional notice requirement prescribed in HSAM § 3005.303-70(d) and that a bridge contract could not have been awarded before SRM Group's performance ended on Sunday, September 30, 2018, even if the Agency filed the Congressional notice before 9:00 a.m., EDT, on Wednesday, September 26, 2018. As noted by defendant, the Agency, however, had already provided Congressional notification of an award to B&O under the Solicitation in June 2018, when the Agency had first selected B&O as the apparent awardee under the Solicitation, prior to the multiple bid protests filed by Safeguard.

Moreover, at the October 17, 2018 oral argument, Agency personnel indicated that the five-day Congressional notice period is not the only step the Agency needs to take when awarding a bridge contract. The Agency needs to negotiate pricing and other terms with a potential bridge contract awardee and needs to prepare and execute documentation justifying the award of a bridge contract. According to Agency personnel, awarding a sole-source bridge contract can take one week to thirty days.[18] The Agency, therefore, would have been without dormitory maintenance services for a period of time if the Agency had awarded a sole-source bridge contract to SRM Group, as counsel of record for Safeguard suggested.[19] The break in dormitory maintenance services, as discussed above, would have adversely impacted the Agency's ability to train federal law enforcement officers, and the Agency would have had to reschedule any canceled classes for more than a year later. Ms. Fowler recognized that it would not be possible to award another sole-source bridge contract to any entity without experiencing a break in dormitory maintenance services and rationally determined that a bridge contract was unworkable under the circumstances. The Agency also was not required to award a sole-

---

[18] On September 27, 2018, Suresh S. Prabhu, the President of SRM Group, sent an email message to Sheryle Wood, a contracting officer with the DHS, containing SRM Group's "Unsolicited Offer to Extend Services on the Housing Project at the current rates for 1 or 3 months." (capitalization in original). Even if the Agency had quickly determined that SRM Group's "unsolicited offer" was in the interest of the Agency and executed another sole-source bridge contract to SRM Group shortly thereafter, the Agency still would have experienced a break in services of dormitory maintenance services, which would have adversely impacted the Agency's ability to train federal law enforcement officers, as discussed above.

[19] At the October 17, 2018 oral argument, counsel of record for B&O indicated that the Agency could have awarded B&O a bridge contract, rather than overriding the CICA stay. As the court's analysis above demonstrates, however, the Agency could not have awarded a bridge contract to Safeguard, B&O, or a different contractor without experiencing a break in dormitory maintenance services, which would have negatively impacted the Agency's ability to train federal law enforcement officers, because of the time required to negotiate a potential bridge contract and the five-day Congressional notification requirement at HSAM § 3005.303-70.

source bridge contract to SRM Group, but was required to consider its alternatives to overriding the CICA stay, which, based on Ms. Fowler's statements in the October 2, 2018 Determination and Findings, the Agency did prior to deciding to override the CICA stay.

Other than awarding a sole-source bridge contract or having the Agency internally provide the dormitory maintenance services, the parties and the Agency have not identified possible alternatives to overriding the CICA stay which would keep dormitory maintenance services in place. Because the Agency could not award a sole-source bridge contract without experiencing a gap in dormitory maintenance services and does not have sufficient staff to provide dormitory maintenance services itself, the Agency was faced with either not having a contractor provide dormitory maintenance services to the Agency, which would have significantly and adversely impacted the Agency's training of federal law enforcement officers, or overriding the CICA stay. The Agency rationally determined that there were no reasonable alternative to overriding the CICA stay.

Regarding the third factor in Reilly's Wholesale, "how the potential cost of proceeding with the override, including the costs associated with the potential that the GAO might sustain the protest, compare to the benefits associated with the approach being considered for addressing the agency's needs," the October 2, 2018 Determination and Findings states that:

**Protest Issues/Analysis:** The protest [at the GAO] rests on two allegations:

a. Allegation 1: **DHS Conducted an Unreasonable and Disparate Pricing Evaluation.** FLETC believes its pricing evaluation was accurate. SBO failed to price a series of CLINs in the amount of $6.1M as specifically directed by the solicitation, as amended. This mistake rendered their price proposal non-compliant as offerors were warned could happen. Also, because the FAR prohibits changing an offerors price as a result of a price realism analysis, it was not possible to compare their price to other compliant priced proposals in the trade-off analysis. Therefore, FLETC expects GAO to rule in its favor.

b. Allegation 2: **DHS Conducted a Flawed Best Value Trade-Off.** The source selection utilized a full trade-off process in accordance with FAR Part 15 in which all non-price factors when added together were approximately equal to price. As stated above, SBO's price proposal was non-compliant and could not be compared to other prices in a trade-off analysis. However, they were also not the highest technically evaluated offeror and the SSA determined the premium price that would be paid to the highest rated offeror was the best value to the Government. Therefore, FLETC expects GAO to rule in its favor.

**Legal Coordination**: In making my determination, I [Robin Fowler] have considered the advice of FLETC's procurement attorney, Mr. James C.

Caine, regarding the merits of the protest that triggered the CICA Stay. In his opinion, based upon his review of the protest, FLETC's position appears to be defensible and well supported by law and fact. Even if GAO were to sustain the protest, however, the interests at risk from delay are so great that they overcome the risks to the Agency of an adverse ruling by the GAO.

(emphasis in original). The October 2, 2018 Determination and Findings also states:

As one of the concerns of override is that the agency would be less likely to comply with GAO's ultimate ruling, it is noted that the Federal Law Enforcement Training Centers was created in 1975, and through its entire history, has never failed to comply with a recommendation of the Government Accountability Office.[20]

The October 2, 2018 Determination and Findings indicates that the Agency, when considering that the GAO might sustain Safeguard's second post-award bid protest, concluded that the Agency believed its position at the GAO to be "defensible" and "well supported by law and fact." The Agency found that the potential consequences that the Agency would endure absent a contractor providing dormitory maintenance services to be "so great that they overcome the risks to the Agency of an adverse ruling by the GAO." After consideration, the Agency has given no indication that it would not comply with GAO's ultimate ruling, and stated that the Federal Law Enforcement Training Center, since its inception in 1975, has never failed to comply with a recommendation of the GAO. Although protestor argues that the "D&F [Determination and Findings] does not even attempt to quantify the economic harm to DHS if Safeguard's GAO protest is sustained," the October 2, 2018 Determination and Findings indicates that the Agency considered the possibility of the GAO sustaining Safeguard's second post-award bid protest and indicates that the Agency was aware that it would incur any costs associated if such a result at the GAO should occur, but concluded the total risks to the Agency were worth overriding the stay. See Superior Helicopter LLC v. United States, 78 Fed. Cl. at 193 (determining that an agency adequately considered the costs of an adverse GAO decision notwithstanding that the agency "did not engage in a quantitative analysis of costs and benefits").

Moreover, in the October 2, 2018 Determination and Findings, the Agency recognized a multitude of benefits to the law enforcement community at large associated with overriding the CICA stay. The October 2, 2018 Determination and Findings indicates that overriding the CICA stay would permit the Agency to continue training federal law enforcement officers at the Agency's current levels while Safeguard's second post-award bid protest is pending at the GAO. The October 2, 2018 Determination and Findings recognizes that overriding the CICA stay allows the Agency to avoid the consequences described in the October 2, 2018 Determination and Finding as being "catastrophic." The

---

[20] "GAO decisions are only recommendations and not binding on the agency." Jacobs Tech. Inc. v. United States, 100 Fed. Cl. 186, 197 (2011) (citing 31 U.S.C. § 3554(b), (e); and Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989)).

Agency also noted that, "by overriding the stay of performance, the period of performance is now long enough for the contractor to begin to implement double-bunking in two dormitories, which is critical to resolving the shortage of on-center lodging." The Agency appears to have considered that the GAO may sustain Safeguard's second post-award bid protest, which the Agency regarded as unlikely, and determined that performance now by B&O, the awardee under the Solicitation, outweighed the costs of transitioning to a different contractor should the GAO sustain Safeguard's second post-award bid protest.

As to the fourth factor identified by the United States Court of Federal Claims in Reilly's Wholesale, "the impact of the override on competition and integrity of the procurement system," the protestor correctly notes that the October 2, 2018 Determination and Findings did not explicitly address the impact overriding the CICA stay would have on the procurement system. In the October 2, 2018 Determination and Findings, however, the Agency did note that a potential concern of impacted parties may be "that the agency would be less likely to comply with GAO's ultimate ruling," but noted that the Agency has never failed to comply with a recommendation of the GAO. The Agency determined that it could not award another bridge contract to SRM Group and also discussed the impact of its previous extensions of SRM Group's performance. Although the words of the Determination and Findings that "it is no longer feasible or proper to continue services under the current contract to a contractor [SRM Group] who is not even an 8A contractor, and the only other option vice an override is to forego these vital services throughout the GAO protest period" is not carefully crafted, it was not necessarily the absence of SRM Group's current 8(a) status that precluded award of a bridge contract to SRM Group. Rather, a variety of issues led to the Agency's decision, including the overall procurement policy consideration of awarding the next contract action to an 8(a) contractor, given that SRM Group had graduated from the 8(a) program years ago. In the October 2, 2018 Determination and Findings, Ms. Fowler states that:

> This lead to my decision to not award a new bridge contract to any contractor outside the 8A program. It takes a total of five days to complete the congressional notification process required for new awards in excess of one million dollars. Thus, it was impossible to prepare and award a bridge contract to the awardee for just the 120-day period required to complete the GAO protest process in time to avoid doing without these services and jeopardizing training.

The October 2, 2018 Determination and Findings, therefore, indicates that the Agency considered the impact that overriding the CICA stay would have on the integrity of the procurement system in light of the impact other potential, albeit unworkable under the circumstances, alternatives would have on the procurement system, such as awarding a bridge contract to a non-8(a) contractor for work that has previously been set-aside for 8(a) contractors and is currently set-aside for 8(a) contractors under the Solicitation.

Based on the record currently before the court, the Agency identified significant adverse consequences that would occur if the Agency did not have a contractor providing dormitory maintenance services, rationally determined that there were no reasonable

alternatives to overriding the CICA stay, considered the costs and benefits associated with overriding the CICA stay, and considered the effects of the Agency's actions on the integrity of the procurement system. The Agency's decision to override the CICA stay based on "urgent and compelling circumstances that significantly affect interests of the United States" and "will not permit waiting for the decision of the Comptroller General concerning the protest," therefore, was not arbitrary and capricious. See 31 U.S.C. § 3553(d)(3)(C).

The Agency's Best Interests of United States Justification

In the October 2, 2018 Determination and Findings, Ms. Fowler indicates that overriding the CICA stay "is also in the best interests of the United States." "In order for a stay override to be proper under a best interests justification, '[t]here must be some rationale—above and beyond the principle aim originally sought when [the agency] decided to engage bidders in the competitive procurement—that absolves the agency of its obligation to await the GAO's recommendation.'" Nortel Gov't Sols., Inc. v. United States, 84 Fed. Cl. at 251-52 (alterations in original) (quoting Advanced Sys. Dev., Inc. v. United States, 72 Fed. Cl. at 31). An allegation that "the new contract is better than the old one in terms of cost or performance is not enough to justify a best interests determination." See Advanced Sys. Dev., Inc. v. United States, 72 Fed. Cl. at 31; see also Intelligent Waves, LLC v. United States, 137 Fed. Cl. at 626 ("An assertion that a new contract is in essence better than a current one is not sufficient to show 'best interests.'" (quoting Advanced Sys. Dev., Inc. v. United States, 72 Fed. Cl. at 31)). "The payment of significantly higher costs under an incumbent or bridge contract," however, may be "the sort of significant adverse consequence to justify an override when these are shown to be prohibitive." See Supreme Foodservice GmbH v. United States, 109 Fed. Cl. at 393.

In the October 2, 2018 Determination and Findings, under a subheading stating that "**[c]ontinued performance is in the Best Interests of the United States**," Ms. Fowler stated, in full, that:

> The corrective actions over the past 3 months have resulted in a monthly contract extension to the incumbent contractor. The first extension resulted in an 11% increase over previous prices, which equals to $104,494.15. The second extension resulted in an additional 7.5% increase, which equals $20,125.99. Then finally, the third extension resulted in an additional 6% increase, which equals $30,682.44. In total, FLETC is now paying in excess of 26% over the original negotiated cost of these services, or $155,372.58 per month. The incumbent, SRM's current monthly price is $325,979.12 over what we would be paying the awardee if the award were not suspended as a result of the first protest, and would cause us to expend close to $1.3 million for the period of the protest more than necessary, had we continued performance with the incumbent. Thus it would fiscally irresponsible to continue down this path, rather than continue services

under the newly awarded contract that was determined to offer the best value to the government and not in the best interests of the Government.

Additionally, by overriding the stay of performance, the period of performance is now long enough for the contractor to begin to implement double-bunking in two dormitories, which is critical to resolving the shortage of on-center lodging.

Finally, and most importantly, as stated previously, this is an 8(a) designated service and the incumbent continuing to perform the work via a bridge contract (extension) would go against the rules of the 8(a) program. The awardee had demonstrated they are the most qualified 8A to perform this work.

(emphasis and capitalization in original).

In the October 2, 2018 declaration signed by Suresh S. Prabhu, who states that he is the President of SRM Group, Mr. Prabhu alleges that:

For the month of September 2018, SRM billed FLETC the following amounts for housing services performed pursuant to the Contract: 1) $[redacted] for the fixed fee items under the Contract; and 2) $[redacted] for the variable items under the Contract (because the number of rooms cleaned each month changes), for a total billing of $891,565.52. At this rate, SRM's annual billing under the Contract would be $10,698,786.24.

The Award made to B&O per the FBO is for $77,734,857.02 for a period of 7 years and 3 months (7.25 years), therefore the average rate that B&O would be billing FLETC for the same services is $10,722,049.24 annually, or $893,504.10 monthly, which is **higher** than what SRM has been charging under its recent extension contracts and would be charging had DHS issued a further bridge contract.

(emphasis in original). Based on the limited and conflicting evidence currently before the court at this stage of the proceeding, however, it is unclear what the economic impact of overriding the CICA stay would be on the Agency's budget.

Protestor's argument as to the Agency's use of the best interests justification, however, overlooks the lack of reasonable alternatives available to the Agency and the significant adverse consequences the Agency would have encountered had the Agency declined to override the CICA stay, as discussed above by the court. Although not specifically restated under the subsection in the October 2, 2018 Determination and Findings addressing the best interests of the United States, the Agency's reasoning for overriding the CICA stay, as expressed throughout the October 2, 2018 Determination and Findings, indicates that overriding the CICA stay was in the best interests of the United States. By overriding the CICA stay, the Agency will be able to continue training

federal law enforcement officers and will be able to continue to attempt to satisfy federal agencies' demands for qualified, trained federal law enforcement officers. As explained in the October 1, 2018 affidavit signed by Thomas J. Walters, if the Federal Law Enforcement Agency did not have a contractor providing dormitory maintenance services,

> the impact on the FLETC's ability to train Federal law enforcement officers and airport screeners would be disastrous. Given the potential consequences of the cancellation of training critical to secure the Nation - and particularly its airports and borders - FLETC would do everything possible to maintain the training schedule. However, it is doubtful FLETC would have the internal resources to operate all nine dormitories without this contract. Consequently, any significant reduction in our lodging capacity would inevitably result in the cancellation of training and concomitant delay in our Federal partners being able to deploy trained law enforcement officers into their operational mission environments.

The October 2, 2018 Determination and Findings also states that, "by overriding the stay of performance, the period of performance is now long enough for the contractor to begin to implement double-bunking in two dormitories, which is critical to resolving the shortage of on-center lodging" and will permit the Agency to increase its capacity to train federal law enforcement officers.

Moreover, by overriding the CICA stay and having B&O provide dormitory maintenance services, the Agency aimed to avoid future disruptions of dormitory maintenance services and transitions of contractors providing dormitory maintenance services. As noted in the October 2, 2018 Determination and Findings, SRM Group has graduated from the 8(a) program, and the resultant contract under the Solicitation, which has been awarded to B&O, is set-aside for 8(a) contractors for which SRM Group is not eligible. Regardless of whether Safeguard prevails on its second post-award bid protest at the GAO, SRM Group cannot be the awardee under the Solicitation because SRM Group is not eligible to receive an 8(a) set-aside contract. Inevitably, the Agency was going to have to transition away from SRM Group, and the Agency's decision, under the circumstances described in the October 2, 2018 Determination and Findings, to transition to the current awardee under the Solicitation, B&O, was a rational Agency decision. Potentially limiting future disruption of federal law enforcement officer training was a rational element of the Agency's decision considered to be in the best interests of the United States, even with the risk of an adverse GAO decision in January 2019. The Agency, therefore, has articulated a rational basis for overriding the CICA stay because, according to FLETC, "performance of the contract is in the best interests of the United States." See 31 U.S.C. § 3553(d)(3)(C).

Turning to the second factor for a temporary restraining order or preliminary injunction, whether protestor will suffer irreparable harm, "[w]hen assessing irreparable injury, '[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction.'" Insight Sys. Corp. v. United States, 110 Fed. Cl. 564, 582 (2013) (quoting Magellan Corp. v. United States, 27 Fed. Cl. 446, 447 (1993));

see also Iron Bow Techs., LLC v. United States, 132 Fed. Cl. 346, 358 (2017) (citing Heritage of Am., LLC v. United States, 77 Fed. Cl. 66, 78, recons. denied, 77 Fed. Cl. 81 (2007)); Rush Constr., Inc. v. United States, 117 Fed. Cl. 85, 101 (2014); CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 494 (2013); Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 743 (2000). If the Agency is permitted to continue acquiring services from B&O as a result of the Agency's override of the CICA stay, Safeguard will not be losing the ability to perform a contract or losing an opportunity to compete for a contract. Safeguard is not the incumbent contractor, nor is Safeguard currently on site and ready to provide dormitory maintenance services. Nor will Safeguard be irreparably harmed "because Safeguard's proposal has been wrongfully eliminated from consideration for award and it has filed a timely challenge of DHS' irrational evaluation with the GAO," as protestor contends. Safeguard's remedy at the GAO will be preserved, regardless of whether this court upholds the Agency's decision to override the CICA stay, as the GAO is currently due to issue a decision on Safeguard's second post-award bid protest at the GAO on or before January 3, 2019. If the GAO sustains Safeguard's second post-award bid protest at the GAO, Safeguard's opportunity to compete for a contract or a portion of a contract under the Solicitation will be maintained.

Additionally, SRM Group, a forty-nine percent owner of the Safeguard joint venture, will not be irreparably harmed if this court finds that the Agency's decision to override the CICA was rational. The Agency's extension of the SRM Group Contract under FAR § 52.217-8 expired in December 2017, and SRM Group performed under sole-source contract actions on the basis of unusual and compelling circumstances under FAR § 6.302-2 from January 1, 2018 to September 30, 2018. SRM Group did not have a right to receive additional sole-source bridge contracts under FAR § 6.302-2 from the Agency after SRM Group's performance ended on September 30, 2018.

Regarding the third factor for injunctive relief, the balance of the hardships, if the court issues a temporary restraining order or preliminary injunction, the Agency will no longer be able to acquire dormitory maintenance services from B&O in the manner in which the Agency is currently receiving B&O's services. The Agency will either have to forgo dormitory maintenance services for an extended period of time and suffer the significant adverse consequences discussed above or award a new bridge contract for dormitory maintenance services, which also will result in the Agency being without dormitory maintenance services for a period of time. The disruption of dormitory maintenance services to the Agency and the costs of transitioning away from B&O and possibly to another new contractor would impose financial hardships on the Agency and would negatively impact the quality of the training provided to federal law enforcement officers. The hardship injunctive relief imposes on the United States would outweigh the harm to Safeguard because a remedy for Safeguard to challenge any alleged improper evaluation by the Agency is preserved at the GAO. See Idea Int'l, Inc. v. United States, 74 Fed. Cl. 129, 142 (2006) ("Constant changing of teachers, regardless of their abilities, would interrupt the quality of education provided. Inevitably, there would be delay in any transition, and a corresponding delay in the expected educational progress of the children. In balancing the harms, the Court's deference to time-sensitive circumstances is well established." (citations omitted)).

Regarding the public interest factor, "'[t]he public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion.'" CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 495 (quoting PGBA, LLC v. United States, 57 Fed. Cl. 655, 663 (2003)); see also Torres Advanced Enter. Sols., LLC v. United States, 133 Fed. Cl. 496, 534 (2017); Cohen Fin. Servs., Inc. v. United States, 110 Fed. Cl. 267, 289 (2013); Am. Safety Council, Inc. v. United States, 122 Fed. Cl. 426, 444 (2015) (holding that "the public interest will be served by an injunction by preserving the integrity of the procurement process"); Applied Bus. Mgmt. Sol., Inc., LLC v. United States, 117 Fed. Cl. 589, 608 (2014); BINL, Inc. v. United States, 106 Fed. Cl. 26, 49 (2012) ("With regard to the public interest, it is well-settled that there is a public interest in remedying violations of law."); United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. 312, 323 (1998) ("[T]he public has a strong interest in preserving the integrity of the procurement process." (citing Parcel 49C Ltd. P'ship v. United States, 31 F.3d 1147, 1153 (Fed. Cir. 1994))); An important public interest is served through conducting "honest, open, and fair competition" under the FAR, because such competition improves the overall value delivered to the government in the long term. See CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 495. In the above-captioned bid protest, the Agency rationally determined to override the CICA stay because of urgent and compelling circumstances and because overriding the CICA stay was in the best interests of the United States, both of which were sufficiently considered before the Agency arrived at its override decision. See 31 U.S.C. § 3553(d)(3)(C). By overriding the CICA stay, the Agency will be able to continue to obtain and improve dormitory maintenance services, services which are critical to the Agency's ability to train federal law enforcement officers for the Agency's ninety-five federal agency partners who rely on FLETC. The Agency also will further maintain the integrity of the 8(a) program by having an 8(a) contractor, B&O, provide services that have been set-aside for 8(a) eligible contractors. Although the automatic stay is no longer in place, the GAO process to review the Agency's procurement process remains active and in place.

## CONCLUSION

Protestor has not demonstrated that the Agency's decision to override the CICA automatic stay was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Protestor's second motion for a temporary restraining order and preliminary injunction, therefore, is **DENIED**. The Clerk of the Court shall enter **JUDGMENT** consistent with this Opinion.

      **IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**